RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ELIZABETH GOODWIN, guardian and next friend on behalf of David Lee Nall; REBECCA CARLUCCI,

*Plaintiffs-Appellees,*

*v.*

CITY OF PAINESVILLE; ROBERTO SOTO, JASON HUGHES, MATTHEW COLLINS, and ROSS TUTTLE, individually and in their official capacities as employees of the City of Painesville,

*Defendants-Appellants.*

No. 14-3120

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-02883—Lesley Brooks Wells, District Judge.

Argued: October 8, 2014

Decided and Filed: March 19, 2015

Before: KEITH, MOORE, and STRANCH, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Timothy T. Reid, MANSOUR, GAVIN, GERLACK & MANOS CO., L.P.A., Cleveland, Ohio, for Appellants. Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO LPA, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Timothy T. Reid, MANSOUR, GAVIN, GERLACK & MANOS CO., L.P.A., Cleveland, Ohio, for Appellants. Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO LPA, Cincinnati, Ohio, for Appellees.

1

———————

**OPINION**

———————

JANE B. STRANCH, Circuit Judge.  Plaintiffs David Lee Nall and Rebecca Nall[1] filed this case following an incident in which Painesville Police Department Officers, initially responding to a noise issue, entered their apartment and tasered Mr. Nall for a total of 26 seconds.  During the tasering, Mr. Nall began foaming at the mouth, stopped breathing, and went into cardiac arrest.  He was rushed to a hospital, where he remained for two weeks.  As a result of his cardiac arrest, Mr. Nall suffers from anoxic brain injury—injury to the brain due to lack of oxygen—and his mental functioning remains greatly impaired.  Both Nalls were charged with disorderly conduct as a result of the incident, though charges against them were later dropped.

The Nalls allege several constitutional claims under 42 U.S.C. § 1983 and several state law claims against the Officers.  The Officers sought summary judgment on the basis of qualified immunity for the federal claims and immunity under Ohio state law for the state law claims.  The district court denied the Officers immunity with respect to all contested claims against them. This appeal followed.  We AFFIRM the judgment of the district court.

## I.  FACTUAL BACKGROUND

The Nalls were hosting a gathering of about seven people in their second-floor apartment in the early morning hours of July 26, 2010.  At around 1:30 a.m., two of the guests were outside arguing with the Nalls' downstairs neighbor.  A police dispatcher sent Painesville Police Department Officers Roberto Soto and Jason Hughes to the Nalls' address, telling them that there was a disturbance outside, possibly a fight.  Ms. Nall could hear her guests arguing outside and asked them to come back in when she saw a police cruiser slowly drive down her street.

When Officers Soto and Hughes arrived, the downstairs neighbor told them that the disturbance was coming from the Nalls' apartment on the house's second floor.  As Officer Soto

———————

[1]Mr. Nall filed this suit through a court-appointed guardian, Elizabeth Goodwin, and Ms. Nall is referred to as both Rebecca Nall and Rebecca Carlucci throughout the record.

stood with the neighbor at the side of the house, he could not hear any noise emanating from the Nalls' residence, but as he approached the rear stairway access to their apartment he could hear yelling coming from within. Officers Soto and Hughes knocked on the Nalls' back door and both David and Rebecca Nall answered. Mr. Nall was wearing only blue jeans, without a shirt or shoes on, and was breathing heavily and sweating. The officers told the Nalls there had been a complaint of some noise, and Ms. Nall responded that some people had been outside, but she had brought them in and everyone would try to keep it down. Mr. Nall acted agitated by the officers' presence at the door, but Ms. Nall said she would get him to calm down. According to Ms. Nall, after Officers Soto and Hughes left, it was "very loud" in the apartment because the guests had been drinking and "people were trying to talk over top of each other." Mr. Nall was mad and was saying he did not want the police there. Ms. Nall went into the kitchen at that time.

Rather than leaving after telling the Nalls to keep the noise down, the Officers remained at the end of the Nalls' driveway because they could hear loud voices coming from the apartment. According to the Officers, as the noise continued and they started seeing neighbors come out, they headed back to the Nalls' apartment to make an arrest or give a citation for the noise. As Officers Soto and Hughes approached the apartment for the second time, a woman later identified as Michelle Prochaska came down the stairs. The Officers state that she told them Mr. Nall was "crazy," had ripped her necklace off, and had said he was going to kill everyone in the apartment and the police. The officers radioed for backup, then continued to the apartment door with the intention of arresting Mr. Nall for disorderly conduct.

When Officers Soto and Hughes came back, Ms. Nall was back in the living room, from where she heard Mr. Nall answer the door, an officer ask him to step outside, and his response that he did not have to step outside. As Mr. Nall returned to living room, Ms. Nall heard a loud noise that sounded as if the officers had kicked the front door open. Officers Soto and Hughes entered the apartment and Ms. Nall saw Officer Soto discharge a Taser at Mr. Nall from about six feet away. She heard a buzzing sound, saw the Taser wires hit Mr. Nall, and saw him immediately drop to the ground. Mr. Nall landed on his back and appeared to involuntarily bring his hands up under his chin as the current ran through him. Officer Soto stood at Mr. Nall's feet. Officers tried to get Mr. Nall's hands behind his back and, according to Ms. Nall, were telling

him to "quit resisting," though it was apparent that his whole body was convulsing due to the Taser, and that he was not resisting. Ms. Nall described this application of the Taser as "so long . . . [i]t felt like they were never letting up on it." R. 34-1, PageID 682. Officer Matthew Collins entered the Nalls' apartment during this time and worked with Officer Hughes to handcuff Mr. Nall. Officer Soto tasered Mr. Nall again, this time using the Taser in drive stun mode—holding electrical contacts at the end of the device itself against Mr. Nall's body. The data file from Officer Soto's Taser shows that the first application of the Taser (through the probes attached to the wires) lasted 21 seconds and that the second application of the Taser (in drive stun mode) lasted 5 seconds. The officers were able to handcuff Mr. Nall soon afterwards.

As the officers were attempting to handcuff Mr. Nall, Ms. Nall was screaming and using profanity. She told them to get off of Mr. Nall and that they had no right to be in the apartment. During this time, one of the Nalls' other guests called 911 to report that police officers had burst into the apartment and used a Taser on Mr. Nall. She said Mr. Nall couldn't follow the officers' instructions to put his hands behind his back "because of the shock" and that "[f]oam was coming out of his mouth . . . they shocked him so bad." R. 39-15, PageID 1208-09.

After Mr. Nall was handcuffed, Officers Soto and Collins took him outside. Officer Hughes and another officer who had arrived on the scene, Officer Russell Tuttle, then arrested Ms. Nall for disorderly conduct. Mr. Nall was also charged with disorderly conduct.

Mr. Nall was unresponsive as the officers moved him out of the apartment, and Officer Collins heard a change in his breathing. Mr. Nall was drooling or foaming from the mouth, he had urinated on himself, and his eyes were open but he did not appear to be conscious. Officers Soto and Collins called for an ambulance and initiated efforts to revive him. Mr. Nall stopped breathing soon after the paramedics arrived, and went into full cardiac arrest at the scene. He was rushed to the hospital, where he remained for over two weeks. Hospital tests indicated that his blood alcohol level was 0.287 mg/100ml, which is markedly elevated.

As a result of his cardiac arrest and the lack of oxygen to his brain, Mr. Nall suffers from severe cognitive impairment that greatly affects his memory and executive functioning. He cannot remember what he has previously done in a day or what he has eaten, and needs reminders to perform most activities of daily living and self-care, including bathing and using the

bathroom. He has forgotten significant life events, such as his wedding. His doctor has recommended constant supervision and support, and the Nalls have moved in with Ms. Nall's parents because Mr. Nall cannot be left alone.

The disorderly conduct charges against both Mr. Nall and Ms. Nall were dismissed based on the decision by a Painesville Municipal Court Judge that the Officers lacked exigent circumstances to enter the Nalls' apartment. The Officers contest the above version of facts in a number of respects, but for the purpose of appeal they have accepted the facts as taken in the light most favorable to the Nalls.

## II. JURISDICTION AND STANDARD OF REVIEW

At the outset, the panel must determine whether it has jurisdiction to hear this appeal. A district court's denial of qualified immunity is an appealable final decision pursuant to 28 U.S.C. § 1291 only "to the extent that it turns on an issue of law." *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 495 (6th Cir. 2012). "Immediate appeal from the denial of summary judgment on a qualified immunity plea is available when the appeal presents a purely legal issue." *Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011) (internal quotation marks omitted); *accord Leary v. Livingston Cnty.*, 528 F.3d 438, 441 (6th Cir. 2008) (noting the court's "jurisdiction does not extend to appeals that merely quibble with the district court's reading of the factual record, as opposed to appeals that challenge the legal premises of the district court's decision").

Because the Officers present multiple purely legal issues for the court's consideration and recognize that the facts will be viewed in the light most favorable to the Nalls, we have jurisdiction over the Officers' appeal. This court "may exercise jurisdiction over the [Defendants'] appeal to the extent it raises questions of law," *Williams v. Mehra*, 186 F.3d 685, 689-90 (6th Cir. 1999) (citation omitted).

We review the denial of summary judgment de novo. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, here the Nalls. *See*

*Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002). We must view all evidence, and draw all reasonable inferences, in the light most favorable to the Nalls. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.  THE QUALIFIED IMMUNITY ANALYSIS

The qualified immunity doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The court follows a "two-tiered inquiry to determine whether a defendant is entitled to qualified immunity." *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In the summary judgment posture, the case must go to the jury if the court finds that "first, there are genuine issues of material fact as to whether [the Officers] violated [the plaintiff's] Fourth Amendment rights in an objectively unreasonable way and, second, those rights were clearly established at the time of [the plaintiff's] arrest such that a reasonable officer would have known that his conduct violated them." *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005). These questions may be answered in either order; if either one is answered in the negative, then qualified immunity protects the officer from civil damages. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson*, 555 U.S. at 236).

This appeal concerns four alleged constitutional violations: that Officer Soto used excessive force against David Nall, that Officers Hughes and Collins failed to protect Mr. Nall from Officer Soto's excessive force, that Officers Soto and Hughes improperly entered the Nalls' residence without a warrant, and that Officers Hughes and Tuttle arrested Ms. Nall without probable cause. Each will be analyzed in turn.

**A.  The Excessive Force Claim Against Officer Soto**

1.  Constitutional Violation

To determine whether an officer's use of force in effecting an arrest is excessive in violation of the Fourth Amendment, a court must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  The inquiry assesses "reasonableness at the moment" of the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  Determining whether the amount of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quotation marks and citations omitted); *accord Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006).

Three important but non-exhaustive factors guide this analysis: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Shreve*, 453 F.3d at 687 (citing *Graham*, 490 U.S. at 396).  Ultimately, the court must determine "whether the totality of the circumstances justifies a particular sort of seizure." *St. John*, 411 F.3d at 771 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)) (internal quotation marks omitted).

The first *Graham* factor—the severity of the crime—weighs in Mr. Nall's favor.  The Officers stated that they returned to the apartment to arrest Mr. Nall for disorderly conduct.  A jury could conclude that disorderly conduct is not a "serious" crime when determining whether an officer used excessive force in effecting the arrest for that crime. *Davis v. Yovella*, 110 F.3d 63, 1997 WL 159363 at *1, *6 (6th Cir. 1997) (table); *see also Thacker v. Lawrence Cnty.*, 182 F. App'x. 464, 472 (6th Cir. 2006) ("disorderly conduct is not a violent or serious crime, and this fact weighs in favor of using less force in arresting [a suspect]").

Regarding the second *Graham* factor, the Officers argue that Prochaska's alleged statements to them provide a reasonable basis for determining that Mr. Nall posed an immediate

threat to their safety or the safety of others.  According to Officer Soto, Ms. Prochaska said Mr. Nall was "crazy," that he had ripped her necklace off, and that he had threatened to kill everyone in the apartment, as well as the police officers.  Officer Hughes provided a substantially similar account of events, adding that Ms. Prochaska also told the officers that Mr. Nall had thrown her down and pushed another female in the apartment.  The Officers' version of events is supported by an affidavit from Ms. Prochaska.  Ms. Nall was in the kitchen when the incident with Ms. Prochaska allegedly took place.  Though Ms. Nall would not have been able to hear exactly what was said, she heard "[n]othing [that] sounded like an argument," only conversation that "sounded like a bunch of drunk people trying to talk over top of each other."  R. 34-1, PageID 673.

Plaintiffs lack testimonial evidence directly contradicting Ms. Prochaska, but they point to several pieces of circumstantial evidence that a reasonable jury could find undermine the Officers' credibility.  First, Ms. Prochaska's affidavit was signed on June 7, 2011,[2] almost a year after the incident and, significantly, one day after Painesville Police Department officers issued her a summons for operating a vehicle under the influence of alcohol (OVI).  Two days after Ms. Prochaska signed the affidavit pertaining to the Nall case, the OVI charges against her were dropped, which the Nalls argue implies that she exchanged her affidavit for a positive outcome in her criminal case.

Further, Officer Soto testified that he planned to arrest Mr. Nall for disorderly conduct even after hearing Ms. Prochaska's statements about Mr. Nall's behavior.  When asked to characterize disorderly conduct, Officer Soto stated that "[d]isorderly conduct is a misdemeanor, fourth degree.  It's nothing."  R. 34-3, PageID 867.  Plaintiffs argue that if it were reasonable for the officers to conclude that Mr. Nall posed a substantial threat and had in fact assaulted Ms. Prochaska, they likely would have sought to arrest Mr. Nall for assault or another more serious crime, rather than for disorderly conduct.

As the district court noted, Officer Soto failed to activate his recording device during the incident, in violation of the Painesville Police Department policy of recording citizen encounters.  This was not the first time—Officer Soto had already been warned about his failure to use a

---

[2]Though the actual affidavit says June 7, 2001 and not June 7, 2011, there is no dispute that the date on the affidavit is a typographical error, and that the affidavit was actually signed on June 7, 2011.

recording device during an earlier citizen encounter.  The district court also observed that a jury could weigh Officer Soto's apparent pattern of avoiding documentation of his actions against his credibility.  Moreover, Officer Soto had once been reprimanded for taking a marijuana pipe out of evidence, an act that the district court found could weigh against his credibility.

The Officers counter that the court must accept Ms. Prochaska's testimony at face value because the Nalls did not present testimonial evidence that refutes her affidavit.  Though the "prospect of challenging a witness['s] credibility is not alone enough to avoid summary judgment," *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998), "summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant's witnesses." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citing *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) (collecting cases)); *see also* 10A Wright, Miller & Kane, Federal Practice and Procedure 2726, at 446 (3d ed. 1998) ("if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial").

The Nalls do not rely on the abstract possibility that a jury might discredit the testimony of Ms. Prochaska and the Officers regarding Mr. Nall's dangerousness.  Rather, they present a series of specific facts that could plausibly place the witnesses' credibility at issue in the mind of a reasonable juror.  The district court was correct to conclude that the facts related to the second *Graham* factor, whether Mr. Nall posed an immediate threat to the safety of the officers or others, remain at issue.

The third *Graham* factor requires the court to consider whether Mr. Nall was actively resisting arrest or evading arrest by flight.  The facts viewed in the light most favorable to the Plaintiffs present two distinct periods of possible resistance:  first, the time leading up to Officer Soto's initial firing of the Taser at Mr. Nall, and second, the period in which Mr. Nall was lying on the floor after the Taser barbs had already struck him.

The constitutional analysis of the first period turns on whether Mr. Nall's refusal to exit his apartment after Officer Soto asked him to do so constitutes "active resistance," as opposed to passive resistance or no resistance at all.  *See Hagans v. Franklin Cnty. Sheriff's Office*, 695

F.3d 505, 509 (6th Cir. 2012); *Eldridge v. City of Warren*, 533 F. App'x 529, 534-35 (6th Cir. 2013). Active resistance to an officer's command can legitimize an officer's use of a Taser. *Hagans*, 695 F.3d at 509. Such resistance can take the form of "verbal hostility" or "a deliberate act of defiance." *Eldridge*, 533 F. App'x at 534-35. When the officers came to the apartment the second time, Officer Soto "asked" Mr. Nall to step out of his apartment. Mr. Nall refused, saying that he did not have to come outside, and withdrew into the apartment. Officer Soto then followed him in and fired the Taser probe into his chest without further instructions or warning. The Officers urge the court to find that Mr. Nall's statement that he did not have to leave his apartment constituted verbal hostility and that his movement from the doorway to the living room constituted a deliberate act of defiance. Neither conclusion is borne out by the case law as applied to the facts taken in the light most favorable to the Plaintiffs.

In *Eldridge*, the plaintiff, who appeared drunk but was actually in the midst of a disorienting diabetes-related episode, repeatedly refused officers' orders to exit his vehicle. *Id.* at 530-31. His repeated refusal to comply was found to constitute only passive resistance that was not sufficient to legitimize the officers' use of force. *Id.* at 535. Likewise, Mr. Nall's single statement that he would not leave his apartment, or the fact that he remained in his apartment rather than exiting, does not in itself render Officer Soto's use of the Taser reasonable.

The constitutional analysis of the second period of possible resistance turns on whether Mr. Nall had ceased resisting as Officer Soto administered the two taserings. Though Mr. Nall clearly did not present his arms for handcuffing in the midst of being tasered, as the officers instructed, there is ample evidence in the record that he did not have control of his body during the ordeal. At her deposition, Ms. Nall explained that when Mr. Nall was tasered, he landed on his back and started to bring his arms up under his chin, apparently involuntarily, then began convulsing uncontrollably as the officers told him to "quit resisting." Ms. Nall testified that Mr. Nall "wasn't resisting, he was convulsing." R. 34-1, PageID 681. The Nalls' guest who called 911 told the operator that "they knocked on the door, he opened the door, next thing I knew he was being tasered. Then they asked him to put his hands . . . behind his back, and he couldn't because of the shock. Foam was coming out of his mouth . . . . He couldn't put his hands behind his back because they shocked him so bad." R. 39-15, PageID 1208-09.

These facts, viewed in the light most favorable to Plaintiffs, establish that it was objectively apparent to a reasonable observer—including Officer Soto, who was standing over him for the duration—that Mr. Nall was convulsing uncontrollably and had ceased all resistance during the tasering. Even if a jury were to credit the Officers' assertions that Mr. Nall posed a danger to them and that he had resisted at the apartment door, the force used against him could still be found to be excessive. We have held that even previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance. *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008).

The final step in the *Graham* analysis requires the court to inquire "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8-9). This court has considered an officer's actions in a given case "in light of testimony regarding the training that [the officer] received." *Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007).

The parties agree that an uninterrupted 21-second application of a Taser is atypically long. According to the department's Taser instructor, a typical Taser cycle lasts five seconds, during which time the officer using the Taser should evaluate the need for further force. Officer Soto had been certified on the Taser since 2004. His training materials included a warning stating that Taser applications

> directly across the chest may cause sufficient muscle contractions to impair normal breathing patterns. While this is not a significant concern for short (5 sec) exposure, it may be a more relevant concern for extended duration applications. Accordingly, prolonged applications should be avoided where practicable.

R. 40-1, PageID 1226. The record further shows that Officer Soto was trained that a subject was more at risk of breathing problems the longer the application of the Taser, and that a prolonged application was one of 15 seconds or more. Though Officer Soto said he had mistakenly believed that a Taser application would last only five seconds even if he depressed trigger longer, he was trained that power would flow through the device continuously until he released the trigger. Officer Soto was also taught that common effects of tasering include the subject falling immediately to the ground, involuntary muscle contractions, and the subject freezing in place with his legs locked.

The "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" called for in *Graham* indicates that a jury could reasonably find that Officer Soto violated Mr. Nall's Fourth Amendment right to be free from excessive force. The prolonged tasering of Mr. Nall was severe: Officer Soto's training indicated that it lasted well into the risky period and that the probes were in a position that could cause breathing problems during extended application. Further, the application of the *Graham* factors to the facts taken in the light most favorable to the Nalls shows: (1) that Mr. Nall's crime was not serious, (2) there was little basis to believe Mr. Nall was a threat to the officers or others, (3) Mr. Nall's initial resistance was at most a passive refusal to comply with a single request to leave his residence, and (4) it was objectively apparent that Mr. Nall's failure to present his hands to be cuffed was due to Taser-induced involuntary convulsions. The Officers' challenges to the Nalls' facts have no place in the court's qualified immunity analysis on appeal. Plaintiffs' facts state a constitutional violation.

2.  Clearly Established Law

Once a court finds a constitutional violation, it must next consider whether "the right was clearly established at the time of the alleged violation." *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012). A right is clearly established if "[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wheeler v. City of Lansing,* 660 F.3d 931, 938 (6th Cir.2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "'[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional.'" *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzner*, 536 U.S. 730, 741 (2002)).

Here, the district court framed the constitutional question as "whether an intoxicated misdemeanant, who had not been placed under arrest and who had neither fled nor resisted, had a right not to be tasered twice in his own home for a total of 26 seconds, as of 26 June 2010." On appeal, the Officers argue both that Mr. Nall had no clearly established right to be free of the initial tasering, and that he had no clearly established right to be free of a tasering that lasted 26

seconds.   Time frames—the initial tasering and then the continued use of force—define two distinct constitutional questions.

### a. The initial tasering of Mr. Nall

There is no clearly established right for a suspect who "actively resists" and refuses to be handcuffed to be free from a Taser application. *Hagans*, 695 F.3d at 509.  Whether Mr. Nall had a clearly established right not to be tasered after refusing to step out of his apartment hinges on whether this refusal and his subsequent return to his living room constituted "active resistance," or was merely "noncompliance" or no resistance at all. *Eldridge*, 533 F. App'x at 534-35.

The cases discussed above under the third *Graham* factor, Mr. Nall's resistance, are instructive.  In *Eldridge,* we determined that "[i]f there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more." *Id.* at 535.  *Eldridge* turned to the facts of earlier cases to identify what constitutes active resistance.  It articulated the principle that "a verbal showing of hostility" can indicate active resistance in situations such as where it was "the final straw in a series of consciously-resistive acts, one of which included a statement that the suspect would 'fight the officers so that they would have a reason to kill him.'" *Eldridge,* 533 F. App'x at 534-35 (quoting *Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 94 (6th Cir. 2012)).  *Eldridge* also noted that a "deliberate act of defiance" using one's body can constitute active resistance, such as where a suspect resisted arrest by "laying down on the pavement and deliberately locking his arms together tightly under his body while kicking and screaming." *Eldridge*, 533 F. App'x at 534-35 (citing *Hagans*, 695 F.3d at 507).

*Eldridge* itself concerned a diabetic driver found in a vehicle on the lawn of a condominium complex who officers suspected of being drunk.  533 F. App'x at 530.  The officers approached the driver, removed his car keys from the ignition, and repeatedly ordered him out of the car. *Id.* at 530-31. The driver repeatedly responded, "I'm fine," until, following several warnings, one of the officers used a Taser. *Id.* at 531. The court determined that excessive force was a jury question based on the clearly established (as of June 2009) "right of a suspect to be free of physical force when he is not resisting police efforts to apprehend him." *Id.* at 535.

The Officers, looking to *Eldridge*, argue that Mr. Nall's statement that he did not have to come outside constituted "verbal belligerence" sufficient to constitute resisting arrest, and that his withdrawal into the living room was "physical defiance" sufficient to constitute the same. But these actions were more akin to the suspect's refusal to exit his car in *Eldridge* than to the continued resistance and hostility present in the active resistance cases, such as *Caie*, that *Eldridge* distinguishes. Under the facts here, moreover, there is no evidence that Mr. Nall even had reason to be aware he was being detained, as Ms. Nall heard Officer Soto merely ask Mr. Nall to step outside. We have found that by mid-2005, "[t]he general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest." *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009).

The Officers urge the court to follow *Cockrell v. City of Cincinnati*, which found no clearly established constitutional violation for the tasering of a person who jaywalked and then fled from a pursuing officer, despite the officer's failure to order the suspect to stop or state that he was under arrest. 468 F. App'x 491, 498 (6th Cir. 2012). But *Cockrell* is distinguishable. There, the suspect's flight and the officer's subsequent pursuit made it clear to the suspect before the Taser was fired that the officer intended to apprehend him. Here, absent a statement that he was under arrest or an order to get on the ground or something similar, it was not objectively apparent that the Officers intended to take Mr. Nall into custody, or that he was not free to remain in his own home.

More importantly, because the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton v. New York*, 445 U.S. 573, 585-86 (1980), the setting of Mr. Nall's arrest renders *Cockrell* inapposite. To arrest a person in his home, police officers need both probable cause and either a warrant or exigent circumstances. A holding that a simple refusal to exit one's own home—and surrender the heightened Fourth Amendment protections it provides—constituted active resistance of an officer's command sufficient to justify a tasering would undermine a central purpose of the Fourth Amendment.

### b. The continued tasering of Mr. Nall

Considering the facts of the incident taken in the light most favorable to the plaintiff, the constitutional question is whether as of June 26, 2010 it was a clearly established violation of a

suspect's constitutional rights to subject him to a prolonged tasering after he had stopped resisting officers' efforts to arrest him. Caselaw reveals that such a right was clearly established.

The Officers contend that Officer Soto is entitled to qualified immunity not just on his initial decision to taser Mr. Nall, but for the duration of the first and second tasering on the basis that there is no clearly established law stating that a suspect has a right to be free of more than one Taser application when the suspect "objectively, reasonably appears to resist arrest." Officer Soto claims that he made a reasonable mistake of fact about how long his Taser would discharge when triggered and that Mr. Nall objectively appeared to resist arrest during the tasering. But as discussed in Section III.A.1, Officer Soto had been trained that electricity would continue to flow past the five second mark, and Ms. Nall testified that Officer Soto stood over Mr. Nall and continued tasering him as he was obviously convulsing and powerless to respond to the officers' commands.

Though it is the Nalls' version of the facts that govern our inquiry here, even if a jury were to credit the Officers' account of events concerning Mr. Nall's alleged initial resistance in the doorway, it could still determine that the extended tasering of Mr. Nall was gratuitous because it extended far past the point that he had ceased resisting. In 2008, this court held that "the gratuitous or excessive use of a taser" violates a clearly established constitutional right. *Landis*, 297 F. App'x at 463. The plaintiff in *Landis* had intentionally blocked a highway with construction equipment while intoxicated, led police officers on a foot chase, and grabbed an officer by the throat, *id.* at 455-56, actions that warranted the use of force to effect his arrest if necessary. But when the officer tasered the plaintiff several times in rapid succession, the plaintiff had one handcuff on, an officer holding his free arm, an officer kneeling on his back, and had pitched face forward into a shallow pool of water, where he drowned. *Id.* at 456-58. Our determination in *Landis* that the officers were not entitled to qualified immunity regarding the use of a Taser, *id.*at 463-64, provided notice that application of a Taser to a suspect who has ceased virtually all resistance constitutes excessive force, even if the suspect had resisted violently earlier in the encounter. *Landis* also demonstrates that whether a suspect has ceased resisting does not simply turn on whether the suspect has already been placed in handcuffs.

In *Shreve*, we held that officers could invoke qualified immunity for using pepper spray against a suspect who hid in a closet obscured from view and disobeyed officers' repeated orders to come out, but that it was a violation of a clearly established constitutional right for the officers to strike the woman with a stick and a knee for a prolonged period of time as she lay on the ground incapacitated by pepper spray, even if she continued to resist having her hands cuffed. *Shreve*, 453 F.3d at 686-88. The *Shreve* court concluded that the officers' force was far in excess of what the woman's minimal resistance after she was removed from the closet justified. *Id.* at 686-88.

We also denied qualified immunity to an officer who sprayed mace in a suspect's face twice, first after the suspect walked away from him during a car stop and refused orders to stop, and then again after he got back in his car and refused to exit. *Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994). Addressing the second use of mace, we held that "a reasonable person would know that spraying mace on a blinded and incapacitated person sitting in a car would violate the right to be free from excessive force" and denied qualified immunity on that basis. *Id.* at 387.

We have held that "the right to be free from physical force when one is not resisting the police is a clearly established right," *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008), and that officers "could not reasonably have believed that use of a Taser on a non-resistant subject was lawful," *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir 2010). *Landis*, *Shreve*, and *Adams* indicate that these principles apply after a suspect has ceased resisting, even if the suspect did offer some resistance at the outset.

We acknowledge that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. In some contexts this would counsel against holding an officer to a standard where it is necessary to evaluate changes in a suspect's behavior over a period of seconds, but with a Taser seconds count. Officer Soto had been trained about the potentially grave consequences of prolonged application, especially to the chest area. Furthermore, by Plaintiffs' account the change in Mr. Nall's physical state was drastic and

immediately apparent to Officer Soto.  On these facts, it is reasonable to hold the officer accountable for noting changes in Mr. Nall's physical state over the 26-second tasering period.

### c.  The entire tasering incident

Because Mr. Nall had a clearly established constitutional right not to be tasered when he was at most offering passive resistance to an officer, and because he also had a clearly established constitutional right not to be gratuitously tasered after ceasing all resistance to the officers, we affirm the district court's denial of summary judgment with respect to Mr. Nall's excessive force claim against Officer Soto.

## B.  The Failure to Protect Claim Against Officers Collins and Hughes

In some cases officers can be held liable for a Fourth Amendment excessive force violation when they were not the ones who actively struck the plaintiff.  *Durham v. Nu'Man*, 97 F.3d 862, 866-67 (6th Cir. 1996) (providing several examples).  A police officer may be held liable for failure to intervene during the application of excessive force when: "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

The Nalls have presented sufficient evidence for a jury to rationally determine that Officers Hughes and Collings both failed to protect Mr. Nall from excessive force.  As discussed in Section III.A above, the facts accepted in the light most favorable to the Plaintiffs show that Officer Soto's use of force against Mr. Nall was excessive.  Officer Hughes was with Officer Soto for the duration of the tasering, and Officer Collins was there for part of that time.  Both were attempting to handcuff Mr. Nall as Officer Soto applied the Taser.  Though the record does not indicate precisely when Officer Collins arrived, it shows that he was in the room and working to handcuff Mr. Nall before Officer Soto applied the Taser to Mr. Nall a second time.  Witnesses indicate that Mr. Nall was convulsing uncontrollably and foaming at the mouth.  Officer Hughes stated at deposition that rigidity in Mr. Nall's arms as the officers tried to handcuff him would be consistent with the effects of a Taser on a group of muscles and could be the reason Mr. Nall did not move his arms as the officers instructed.

Neither Officer Hughes nor Officer Collins told Officer Soto to release the Taser's trigger during the first application, and neither officer attempted to prevent Officer Soto from administering the additional drive stun. Citing *Turner*, the Officers argue that because Officers Hughes and Collins did not see the Taser barbs actually strike Mr. Nall, they cannot be held liable for failure to protect. *Turner* concerned two discrete hits with the butt of gun in an officer's equipment bag, one even by the plaintiffs' account minor and apparently accidental, and the plaintiffs conceded that the officer who allegedly failed to assist had his back turned to them for the duration of the incident. *Turner*, 119 F.3d at 429-30. The *Turner* court found that there was no failure to protect when the record was "devoid of any suggestion" that the officer accused of failing to protect actually observed or should have known of the actions taken by the officer who applied the force. *Id.* at 429.

But unlike *Turner*, the instant case involves a prolonged application of force and the officers who allegedly failed to protect were directly involved. Plaintiffs have presented sufficient evidence about Mr. Nall's condition during the 21-second tasering to make it a jury question whether a reasonable officer in Officer Hughes's or Officer Collins's position would have seen that the force being applied to Mr. Nall was excessive and taken action to get Officer Soto to stop applying it.

Because *Turner* demonstrates that Officers Collins and Hughes had a clearly-established duty to protect Mr. Nall dating back to at least 1997, and the facts indicate that both failed in this duty, we affirm the district court's denial of qualified immunity to both officers on this claim.

## C. The Officers' Entry into the Apartment

The Supreme Court has declared, as a "basic principle of Fourth Amendment law," that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586. Exigent circumstances are among the few "well-defined" and "carefully circumscribed" exceptions to the warrant requirement. *See United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (citing *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). Because warrantless searches are presumptively unreasonable under the Fourth Amendment, the government bears a "heavy burden" of proving exigency. *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). In general,

exigent circumstances exist when "'real immediate and serious consequences' will 'certainly occur' if a police officer postpones action to obtain a warrant." *Williams*, 354 F.3d at 503 (quoting *Welsh*, 466 U.S. at 751).

We have identified the emergency situations giving rise to the exigent circumstances exception to the warrant requirement as (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others. *Williams*, 354 F.3d at 503 (citing *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994)). After finding that "none of the traditionally recognized exigent circumstances is squarely presented under the facts" of the case before it, this court has also recognized an additional exigent circumstance, based on "an ongoing and highly intrusive breach of a neighborhood's peace in the middle of the night." *United States v. Rohrig*, 98 F.3d 1506, 1519 (6th Cir. 1996).

Here, the Officers argue that they were permitted to enter the apartment under *Rohrig*'s limited exception to the warrant requirement or, in the alternative, on the traditional exception of risk of danger to others, on the basis that Mr. Nall had allegedly assaulted one person in the apartment and posed a risk to the other people inside.

1.  The *Rohrig* analysis

In *Rohrig*, two police officers responding to a late night noise complaint could hear loud music coming from the defendant's home from about a block away. *Id.* at 1509. Soon after the officers arrived, a group of neighbors approached them to complain about the noise. *Id.* One officer banged repeatedly on the front door of the defendant's home but received no response; the other unsuccessfully attempted to obtain the telephone number of the residence. *Id.* From outside the house, the officers observed two sets of stereo speakers inside and discovered that the home's rear entrance had only an unlocked screen door securing it. *Id.* Both officers loudly announced their presence and then entered the house, continuing to announce their presence as they moved from room to room. *Id.* They discovered marijuana plants, the stereo, and the defendant, who was intoxicated and asleep on the floor. *Id.*

In fashioning its "new exigency that justifies warrantless entry" on the above facts, the *Rohrig* court created a three-part test based on the Supreme Court's Fourth Amendment jurisprudence:

> First, we must ask whether the Government has demonstrated a need for immediate action that would have been defeated if the . . . police officers had taken the time to secure a warrant. Next, we must identify the governmental interest being served by the officers' entry into [the] home, and ask whether that interest is sufficiently important to justify a warrantless entry. Finally, we must weigh this governmental interest against Defendant's interest in maintaining the privacy of his home, and ask whether Defendant's conduct somehow diminished the reasonable expectation of privacy he would normally enjoy.

*Id.* at 1518. The *Rohrig* court found that the very late hour, the blasting music audible from at least a block away, and the "irate group of pajama-clad neighbors" outside demonstrated that time was of the essence, and that the defendant's expectation of privacy was diminished because he was "projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace." *Id.* at 1522.

Considering the second prong, the government interest involved, the *Rohrig* court acknowledged that reliance on a noise ordinance might suggest a diminished government interest because Supreme Court precedent instructs that the weight of a government interest "should be measured in part by the severity of the offense being investigated." *Id.* (citing *Welsh*, 466 U.S. at 742-43, 753-54. But the court found that the *Welsh* analysis "has less relevance as one moves away from traditional law enforcement functions and towards what the Supreme Court has referred to as 'community caretaking functions.'" *Rohrig*, 98 F.3d at 1521 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Because the officers in *Rohrig* were not aiming to "track down a suspected violator of a local ordinance," the court found it "inappropriate to gauge the government's interest by looking only to that ordinance." 98 F.3d at 1521. Relying heavily on the specific facts presented, the court found that by entering the residence "for the limited purpose of locating and abating a nuisance," the officers were restoring "the neighbors' peaceful enjoyment of their homes and neighborhood," and that given "the importance of preserving our communities," the interest "is not so insignificant that it can never serve as justification for a warrantless entry into a home." *Id.*

Applying *Rohrig* to the facts here provides no exception to the warrant requirement. First, an argument between two people outside the Nalls' home triggered the noise complaint that brought the officers there. But when Officer Soto arrived at the scene at about 1:33 a.m. the Nalls' disputing guests were already inside and Soto could hear nothing until he was at the stairs to the Nalls' apartment. Though the noise escalated after the officers gave their first warning and left, the Taser log shows that Mr. Nall was tasered at 1:41 a.m., under ten minutes after that initial warning. These facts cannot show that the Nalls were generating the type of ongoing and overbearing public disturbance that would give rise to the necessity for immediate action.

The facts here also do not suggest a government interest in entering the home similar to that of the officers in *Rohrig*. In *Rohrig*, the officers entered seeking an occupant to turn off the blaring stereo; here, the Nalls were at home and responded to the officers' knocks on the door on both occasions. The second time the officers came, they did not tell David Nall to quiet his home or issue him a citation for a noise violation; they immediately asked him to step out of the apartment, and then entered the apartment by force. The timing of the sequence of events matters. Several minutes of elevated noise cannot so diminish the Nalls' interest in maintaining their privacy that a warrantless entry would be permitted under *Rohrig*. *Rohrig*—as expressly recognized in the opinion—is a narrow, fact-specific holding:

> We wish to emphasize the fact-specific nature of [our] holding. By this decision, we do not mean to fashion a broad 'nuisance abatement' exception to the general rule that warrantless entries into private homes are presumptively unreasonable. We simply find that, in some cases, it would serve no Fourth Amendment purpose to require that the police obtain a warrant before taking reasonable steps to abate an immediate, ongoing, and highly objectionable nuisance, and we conclude that this is just such a case.

*Rohrig*, 98 F.3d at 1525 n.11.

To allow entry under *Rohrig* on the facts of the instant case would transform *Rohrig's* narrow holding into the broad nuisance abatement exception that the *Rohrig* court expressly eschewed. No reasonable officer could find that five to ten minutes of noise emanating from the Nall home late at night was such an "immediate, ongoing, and highly objectionable nuisance" as to permit warrantless entry absent additional facts sufficient to meet the recognized exceptions to the warrant requirement.

2.  Exigent circumstances based on threat of violence to officers or others

Under the exigent circumstances exception concerning the threat of violence to officers or others, police officers "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Schreiber v. Moe*, 596 F.3d 323, 329-30 (6th Cir. 2010) (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (internal quotation marks omitted)).  For an entry to fall within this exception, there must exist "an objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid." *Fisher*, 558 U.S. at 47 (internal quotation marks and citations omitted). In civil cases, "this question is normally left to the jury" if "there is room for a difference of opinion." *Schreiber*, 596 F.3d at 329-30 (citing *Ingram v. City of Columbus,* 185 F.3d 579, 587 (6th Cir.1999) (internal quotation marks omitted)).

Here, the Officers argue that the exigent circumstances exception to the warrant requirement applies because Ms. Prochaska's statements about Mr. Nall's violent and threatening behavior in the apartment created an objectively reasonable belief in the minds of Officers Soto and Hughes that people within the house were in need of immediate aid.  But as discussed in Section III.A.1 above, the Nalls have raised several concrete issues that place the credibility of Ms. Prochaska and the Officers at issue.  The Nalls also note that when the Officers approached the Nalls' residence, Ms. Prochaska herself had already left, that other guests were in the living room of the apartment, and that there was no indication that they needed any immediate assistance from the officers.

Substantial authority has consistently indicated that warrantless entries based on the emergency aid exception require both the potential for injury to the officers or others and the need for swift action.  The right to be free from warrantless search under this exception absent these factors is clearly established.  The remaining question, which cannot be answered as a matter of law on summary judgment, is whether the facts of this case meet those criteria. Because the pertinent facts are in dispute under the emergency aid exception, and because the *Rohrig* exception does not apply, we affirm the district court's denial of summary judgment on the basis of qualified immunity with respect to the warrantless entry.

**D. Ms. Nall's Disorderly Conduct Arrest**

Officers Hughes and Tuttle arrested Ms. Nall for disorderly conduct during the conclusion of the incident with Mr. Nall. Ms. Nall admits that she raised her voice, cursed at the officers, and was upset, but argues that her acts were not unreasonable under the circumstances, and that the officers therefore did not have probable cause to arrest her. On summary judgment, the district court held that—given the factual dispute about the legitimacy of the officers' entry into the Nalls' home and whether or not Officer Soto's use of force was gratuitous—it was "not prepared to rule as a matter of law that Mrs. Nall's loud verbal protests made from her couch should have constituted a criminal behavior in the eyes of a reasonable officer." R. 69, PageID 2661.

The validity of an arrest "does not depend on whether the suspect actually committed a crime . . . ." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Rather, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The Fourth Amendment standard for probable cause requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S. at 37. The qualified immunity doctrine requires that "probable cause determinations, even if wrong, are not actionable as long as such determinations pass the test of reasonableness." *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir.1993). The reasonableness of an officer's probable cause determination is a question of law. *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224 (1991)).

To determine whether the officers had probable cause to arrest Ms. Nall, the court "must look to the law of the jurisdiction at the time of the occurrence." *Ingram*, 185 F.3d at 594. The officers arrested her for an alleged violation of Ohio Revised Code § 2917.11(A)(2), which states: "No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following: . . . (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person." Under Ohio law, a person acts with the required mental state for the crime—recklessness—

"when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." Ohio Rev. Code § 2901.22(C).

Long ago, the Ohio Supreme Court held that "a person may not be punished under R.C. 2917.11(A)(2) for 'recklessly caus(ing) inconvenience, annoyance, or alarm to another,' by making an 'offensively coarse utterance,' or 'communicating unwarranted and grossly abusive language to any person,' unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." *State v. Hoffman*, 387 N.E.2d 239, 242 (Ohio 1979). The standard with regard to statements made to police officers is the same as for any other person: "The question is whether, under the circumstances, it is probable that a reasonable police officer would find her language and conduct annoying or alarming and would be provoked to want to respond violently." *Warren v. Patrone*, 600 N.E.2d 344, 345 (Ohio Ct. App. 1991) (quoting *State v. Johnson*, 453 N.E.2d 1101, 1103 (Ohio Ct. App. 1982)).

The result does not alter if the incident takes place in a dwelling: A man repeatedly yelling, "If you don't have a f—ing warrant, get out" at police officers who entered an apartment was found not to be violating the disorderly conduct statute because the language would not "provoke the average person to an immediate retaliatory breach of the peace." *State v. Maynard*, 673 N.E.2d 603, 604, 606 (Ohio Ct. App. 1996).

Even if we were to assume, as the Officers argue, that the level of noise Ms. Nall was making could itself violate Section (A)(2), the fact remains that under the plain language of the statute, a disorderly conduct charge against her can stand only if she "recklessly caused inconvenience, annoyance, or alarm" by "unreasonably" making the noise. Ohio Rev. Code § 2917.11(A)(2). Ms. Nall testified that during the incident with Mr. Nall, she was screaming at the officers that they had no right to be in her house, that she was swearing, and that she was "freaked out." One of the officers told Ms. Nall to "shut the f— up," repeatedly tried to quiet her, and told her that he would arrest her if she did not calm down. R. 34-1, PageID 684-85.

But because Ms. Nall had a clear basis to be concerned about her husband's physical safety and was responding to a possibly illegal entry into her home by the officers, we cannot conclude at the summary judgment stage that her conduct was sufficiently reckless and unreasonable to allow an officer to reasonably believe there was probable cause to arrest her.[3] Accordingly, we affirm the district court's denial of summary judgment with regard to the arrest of Ms. Nall.

## IV. STATE LAW CLAIMS AGAINST THE OFFICERS

Under Ohio law, a municipal employee is generally immune from civil liability unless one of a small number of exceptions applies. *See* Ohio Rev. Code § 2744.03(A)(6). The only exception to state law immunity at issue in the instant case is whether the Officers' "acts or omissions" were made "in a wanton or reckless manner." *Id*. If the officers' acts were wanton or reckless, they are not entitled to immunity for state law claims under Ohio law. *Id.*

The lone basis for the Officers' appeal of the district court's decision not to grant them state law immunity on summary judgment is that "[n]o evidence shows that Officers *had actual knowledge* of a great probability of harm to strip them of immunity on state law claims." Appellants' Br. at 24 (emphasis added). The Officers further stress that "the standard for wanton and reckless under Ohio law is greater than negligence and *requires actual knowledge*, which none of the officers had." Appellants' Br. at 25 (emphasis added).

The Officers are mistaken on this point, as their cited authority demonstrates. Though wantonness requires awareness of a given risk, recklessness does not. *Anderson v. Massillon*, 983 N.E. 2d. 266, 273 (Ohio 2012). Wantonness and recklessness are "different and distinct degrees of care and are not interchangeable." *Id*. "Reckless conduct is characterized by the conscious disregard of or indifference to a known or *obvious* risk of harm to another that is

---

[3]The Officers argue that the U.S. Supreme Court's holding in *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), favors their position and controls this issue. But in *Atwater* the Court determined that the Fourth Amendment does not forbid a warrantless arrest for a minor criminal offense that is punishable only by a fine. *Id*. at 323. The plaintiffs in *Atwater* had consistently conceded that the woman taken into custody had violated the seatbelt statute at issue. *Id.* at 325 ("Given Atwater's admission that she had 'violated the law' . . ."). Whether the officer had probable cause to arrest Ms. Atwater was not the issue. Here, the issue is not whether the officers could take Ms. Nall into custody if she had indeed violated the disorderly conduct statute; rather, the issue is whether the officers had probable cause to determine that she violated the disorderly conduct statute in the first place. *Atwater* therefore does not have any bearing on the probable cause issue in this case.

unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* (emphasis added). An actor can be found to be reckless either based on his actual knowledge of a risk of harm or under an objective standard (that the risk is "obvious"). That § 2744.03(A)(6) looks to  an objective standard of proof for recklessness is further illustrated by *Anderson*'s reference to § 500 of the Restatement (Second) of the Law of Torts. Comment a to § 500 states that an actor can be found to be reckless when he

> has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.

Restatement (Second) of Torts § 500 (1965).

Because there is no requirement that the officers have actual knowledge of a risk of harm for a jury to find that they met the objective recklessness standard provided for in the Ohio statute, we affirm the district court's holding with regard to state law immunity.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's summary judgment decision in all respects.