NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0141n.06

No. 17-1448

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MARC S. CARTER, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ANDREW CARTER; JOSEPH MONTGOMERY; | ) | COURT FOR THE EASTERN |
| NICHOLAS KRINGS; DEPUTY GALIMBERT, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

FILED
Mar 15, 2018
DEBORAH S. HUNT, Clerk

BEFORE: ROGERS, McKEAGUE, and WHITE, Circuit Judges.

ROGERS, Circuit Judge. This case is an interlocutory appeal of the district court's denial of qualified immunity to several defendant police officers on Marc Carter's Section 1983 excessive-force claim. Carter led the officers on a high-speed chase but was eventually apprehended after crashing the stolen car he had been driving. He claims that the officers used excessive force when securing his arrest because they continued to hit him after a previous strike had knocked him to the ground where, "semi-unconscious," he "ball[ed] up" to protect himself from a serious beating involving multiple punches and kicks. However, an officer's dashboard camera captured the altercation on video, and the recording shows that, while Carter was on the ground, only one officer administered three to four modest punches. Those strikes were plainly not an unreasonable use of force. Further, because the video does not support an inference that the one officer acted with malice or in bad faith, state-law governmental immunity was also

warranted on Carter's claim of intentional infliction of emotional distress. The district court therefore erroneously denied the defendant officers' motion for summary judgment.

I.

On the night of August 9, 2012, Marc Carter did not stop when an Eastern Michigan University police car flashed its patrol lights. Carter led the EMU officers and other responders from the Ypsilanti Police Department and Washtenaw County Sheriff's Office (to which the defendants in this case belong) on a high-speed chase for about ten minutes. Carter tore down highways and through residential neighborhoods at speeds nearing 100 miles per hour. He ran several red lights and stop signs, weaved through lanes of traffic, and forced cars off the road. Carter eventually lost control of the vehicle, veering off the road and crashing into a ditch.

Carter attempted to continue his flight on foot, but Deputy Joseph Montgomery grabbed him from behind and pulled him backwards. Carter was hit several times and brought to the ground. One of those strikes was a punch to the face administered by Deputy Carter, which caused Carter to fall to the ground and left him "semi-unconscious" or "dazed." While Carter lay on his side in the fetal position, he attempted to shield himself from the officers' repeated kicks and blows. According to Carter, this was a subconscious reaction to his being struck, an attempt to "ball up and protect [him]self." Carter further testified that the officers "kept hitting" him and that he was "not going to just give away, I'm going to try to protect myself . . . from being hit." Carter asserts that, while beating him, the officers never instructed him to stop resisting or to put his hands behind his back, and he states that, once the officers eventually did give that order, he complied immediately. In his deposition, Carter said that Deputy Carter punched him, Deputy Montgomery hit him "at least once or twice" in his backside and held him

down, Deputy Krings hit him in his chest area at least once, and one of the officers kicked him "more than once." Deputy Galimbert "didn't stop [the other officers] from beating [Carter]."

Deputy Carter's dashboard camera, however, tells a different story. Once the officers brought Carter to the ground, he is blocked from view by a police car but the camera clearly shows the officers, from the waist up, who are attempting to place him in handcuffs. The video shows that, while Carter was on the ground, only one of the officers struck him three to four times. The video gives no indication that any of the officers kicked Carter, and it is difficult to see how any officer possibly could have done so, given that each officer was either crouched down or leaned over during the relevant timeframe. Less than thirty seconds after those three to four hand-strikes, all resistance and struggling had ceased.

After that scuffle, Carter was taken to hospital, where an examination determined that he had sustained a one-centimeter laceration to the forehead and a "minimal deformity" of the left nasal bone, which possibly indicated a nondisplaced fracture. On March 26, 2013, Carter pled guilty to several charges stemming from his August 9 conduct, including felony resisting arrest. At his plea colloquy, Carter admitted that he "tr[ied] to flee" and "tried to get out [of the car] and tried to run." When the judge asked Carter whether there was "a fight between [him] and the police while they were trying to arrest [him]," he responded, "They tried to apprehend me and they used their force to apprehend me. Excessive from my opinion, but they did their job I guess."

From prison, Carter filed the four-count complaint in this case. Counts one and two allege that the officers violated Carter's Fourth Amendment rights by using excessive force and by "failing to intervene in his being subjected to excessive force," respectively. Count three is a

state-law gross-negligence claim against the officers,[1] and count four is a state-law claim for intentional infliction of emotional distress. The complaint names Andrew Carter, Joseph Montgomery, Nicholas Krings, and Deputy Galimbert, in their individual capacities, as defendants.

The defendant officers moved for summary judgment, asserting qualified-immunity and state-law governmental-immunity defenses, and the district court referred that motion to a magistrate judge. Carter filed no response. The magistrate issued a report and recommendation proposing that the district court deny qualified and governmental immunity, to which the defendant officers objected. The district court agreed with the magistrate's recommendation. The district court found a genuine issue of material fact about whether Carter was actively or passively resisting, concluding that his conduct "reasonably could be found by a jury to be nothing more than a failure to comply with an order to present his hands, which . . . is properly viewed as mere 'passive resistance,' which is not enough to justify repeated punching and kicking by officers." The officers were therefore not entitled to qualified immunity because:

> [T]he right to be free from the application of excessive force during an arrest was clearly was [sic] established in August 2012, and the Sixth Circuit's decisions on point supplied ample direction to the defendants so that they should have known that kicking and beating a cowering suspect who does nothing more than fail to present his hands or arms upon request for handcuffing was constitutionally unreasonable. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012).

With respect to state-law governmental immunity, the district court noted that, on Carter's version of the facts, there was a genuine dispute about whether the defendant officers acted with intent or malice, and so summary judgment was not appropriate on that issue. The officers

---

[1] The magistrate judge recommended dismissing this claim, and Carter did not object to that recommendation, so it is not before us.

brought this interlocutory appeal, seeking review of the district court's rejection of their qualified-immunity and state-law governmental-immunity defenses.

II.

Were we to accept Carter's version of the facts, as the district court ordinarily must on a defendant's motion for summary judgment, we would agree with the district court's decision. Upon repeated and careful viewing of the video, however, we conclude that the officers are entitled to qualified immunity because the force used to secure Carter's arrest was not as described by Carter and was not excessive. Even though the district court determined that there was a genuine issue of material fact about whether Carter was actively or passively resisting, the officers' interest in securing Carter's arrest outweighs Carter's interest in being free from the few modest hand strikes shown in the video.

The video captured by Deputy Carter's dashboard camera shows that the force used to secure Carter's arrest was not excessive. At summary judgment, "facts must be viewed in the light most favorable to the nonmoving party" unless the nonmovant's version of the facts is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Such a blatant contradiction is present here. Carter asserts that he was hit several times by multiple officers and kicked more than once, and that, while on the ground, his "balling up" was merely an attempt to shield himself from the officers' repeated kicks and blows. The video tells quite a different story. While Carter was on the ground, the only apparent force was one officer's three to four hand-strikes over a period of around ten seconds. None of those strikes appears to be particularly forceful. Contrary to Carter's allegations, none of the officers kicked him. The altercation between Carter and the defendant officers was simply not the savage beating he makes it out to be.

Nonetheless, Carter argues that the force employed by the officer was per se excessive because the earlier strikes had incapacitated him such that he was, at most, passively resisting.[2] Our precedents do suggest that officers cannot continue using force against an arrestee who has stopped resisting. As we said in *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015), "When a suspect actively resists arrest, the police can use [force] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Id.* at 642; *see also Goodwin v. City of Painesville*, 781 F.3d 314, 323–26 (6th Cir. 2015). But the fact remains that the officers had the lawful authority to arrest Carter, and it is undisputed that his "balling up" left the officers unable to place him in handcuffs because they did not have access to his hands. Indeed, Carter later stated, "I'm . . . not going to just give way [to be handcuffed]." That means that *some* amount of force was necessary to secure Carter's arrest, and the officer's decision to apply three to four modest punches, rather than, for instance, rolling him over or pulling his arms out from under him, was not constitutionally infirm. *Cf. Rudlaff*, 791 F.3d at 642 ("[P]ivotally, [the plaintiff] admitted at his deposition that he tried to prevent [officers] from handcuffing him—*i.e., he conceded that he resisted arrest*."). In other words, that the officers' use of force may not have been the only—let alone the best—method to secure Carter's arrest does not make it a constitutionally impermissible method of so doing.

When judging officers' use-of-force decisions in the qualified-immunity context, we are mindful of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Conner*, 490 U.S. 386, 397 (1989). Deciding whether an officer's use of force was reasonable "requires a careful balancing of the nature and

---

[2] Because there is no record evidence blatantly to the contrary (because Carter is out of the dash camera's frame), we accept, as the district court did, Carter's version of the events as true. *See Scott*, 550 U.S. at 378.

quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotations omitted). Here the governmental interest in securing Carter's arrest outweighs Carter's interest in being free from a few modest strikes. Thus, even though we assume that Carter was merely passively resisting, the officer's use of force was still an objectively reasonable way to arrest him.

The defendant officers were also entitled to governmental immunity under Michigan law with respect to Carter's claim of intentional infliction of emotional distress. "Michigan law insulates police officers from intentional-tort lawsuits if they acted within the scope of their employment, if their actions flowed from discretionary rather than ministerial duties and if they acted in good faith [or without malice]." *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013) (citing *Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008)). Only the last element—good faith or lack of malice—is at issue here. Review of the video footage unequivocally shows that the one officer who struck Carter while he was on the ground did not act in bad faith or with malice, and a reasonable jury could reach no other conclusion. As discussed earlier, some modicum of force was necessary to secure Carter's arrest given that his balling up prevented the officers from reaching his hands, and the force used did not exceed that required amount. State-law governmental immunity therefore applies.

For these reasons, we reverse the district court's denial of the officers' motion for summary judgment.