NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0707n.06

Case No. 14-5068

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 08, 2014
DEBORAH S. HUNT, Clerk

BRENDA MARGESON,                          )
                                          )
        Plaintiff-Appellee,               )        ON APPEAL FROM THE UNITED
                                          )        STATES DISTRICT COURT FOR
v.                                        )        THE  MIDDLE  DISTRICT  OF
                                          )        TENNESSEE
WHITE COUNTY, TENNESSEE,                   )
        Defendant,                        )
                                          )        OPINION
RICHARD LYNCH; JOSEPH WILLIAMS;            )
and CHRIS ISOM,                           )
                                          )
        Defendants-Appellants.            )

BEFORE: BOGGS and DONALD, Circuit Judges; HOOD, District Judge.[*]

**BERNICE BOUIE DONALD, Circuit Judge.**  Officers Chris Isom, Richard Lynch,

and Joseph Williams, of the White County, Tennessee Sheriff's Department, appeal the district

court's denial of qualified immunity on their motion for summary judgment in this 42 U.S.C. §

1983 action brought by Brenda Margeson for the shooting death of her husband, James

Margeson.  For the following reasons, we **AFFIRM** the district court.

I.

In 2011, after years of documented substance-abuse problems and domestic violence

incidents, the Tennessee Department of Children's Services informed Mr. and Mrs. Margeson

_____

[*] The Honorable Denise P. Hood, United States District Judge for the Eastern District of
Michigan, sitting by designation.

1

that it planned to file a petition to permanently terminate their parental rights. Shortly thereafter, James Margeson escalated his use of narcotics, and Mrs. Margeson observed that her husband's behavior was "spiraling out of control." Around that same time, James Margeson was arrested on drug charges, and was scheduled for a hearing on July 22, 2011.

Prior to his scheduled court date, Mr. Margeson told his wife that he would not appear for the hearing. According to Mrs. Margeson, her husband began carrying a pistol and told her that he intended to pull his gun on the police if they came to arrest him. When Mr. Margeson failed to appear for his scheduled hearing, he received a text message from his "bonds lady" indicating that the police were going to arrest him for his failure to appear in court.

On July 22, 2011 — the day of the events in question — the Margesons were staying at the home of James Margeson's mother, Rita Brock. That morning, they walked over to Mr. Margeson's aunt's house for breakfast. Mrs. Margeson testified that her husband was armed with a pistol at breakfast, and that she had seen him possessing "a long gun with a cartridge" earlier that morning. When someone at breakfast confronted Mr. Margeson about his failure to appear in court and asked him whether he intended for the police to shoot him, he responded by stating something like "that is a part of life," and also made a comment along the lines that the police would have to "take him out in a body bag."

After breakfast, the Margesons went back to Ms. Brock's home. James Margeson lay down on the couch with his handgun under a pillow and an assault rifle in reach, beneath the couch. Mrs. Margeson lay down next to him, hoping that he would fall asleep so that she could remove the guns from his reach. Meanwhile, out of concern for her son's safety, Rita Brock went to the Sheriff's Department to report her son's erratic behavior. Ms. Brock spoke with Sheriff Shoupe about the statements her son had made at breakfast, and informed him that Mr.

Margeson was armed with guns inside her house. Sheriff Shoupe learned that the General Sessions Court for White County had issued a bench warrant for Mr. Margeson's failure to appear, and assembled a group of officers to execute the warrant. Before departing to arrest Mr. Margeson, Sheriff Shoupe apprised his team of the information provided by Ms. Brock.

When the officers arrived at the Brock residence, they took positions around the house: several officers approached the front of the house, others went to the back of the house and set up a perimeter, and one officer remained in the driveway. When Mrs. Margeson heard a car pull up, she opened the front door and was met by Detective Craig Capps. Mrs. Margeson then turned toward her husband and told him that the police were outside. Detective Capps instructed Mrs. Margeson to put her hands up, and then pulled her away from the front door.

As the other officers made their way towards the house, Mrs. Margeson said, James Margeson "jumped up and grabbed his guns." Several of the officers ordered Mr. Margeson to drop the gun and show his hands. Officer Isom saw James Margeson coming through the front door with a rifle pointed at him, and fired the first shot. When Officer Lynch, who had been crouched down in front of Officer Isom, heard the first shot, he also started firing at Mr. Margeson. Officer Williams started shooting toward the entrance of the home as well, though the timing and sequence of his actions is less clear. While the two other officers were still shooting into the house at Mr. Margeson, Officer Isom charged towards the doorway, and saw Mr. Margeson "[fall] to the floor and [come] up with a handgun." Officer Williams stopped shooting for a brief moment, but started firing at Mr. Margeson again after Officer Isom retreated from the doorway.

When the shooting finally stopped, Detective Capps entered the house, removed the weapons, and administered first aid to Mr. Margeson, with assistance from Officer Lynch.

3

While receiving first aid from the officers, Mr. Margeson made statements to the effect of "I made you do it" and "I couldn't do it myself." Mr. Margeson was transported to a hospital by helicopter, where he later died from the gunshot wounds.

The total number of shots that were fired remains unclear. The Tennessee Bureau of Investigation ("TBI") investigative report concluded that Mr. Margeson suffered 21 separate gunshot wounds, and that another 23 bullet holes were lodged in the home. Based on the TBI Report and James Margeson's autopsy report, Mrs. Margeson contends that the Officers fired between 36 and 43 shots in total, with about half of those shots hitting Mr. Margeson. The Officers counter that these reports are misleading, because at least some of the shots were from shotguns with .00 buckshot, which could produce more than a single bullet per shot.

## II.

In June 2012, Mrs. Margeson, as next of kin and on behalf of the Margesons' five minor children, filed suit against the White County Sheriff's Office and the individual officers involved in her husband's death. This appeal concerns only the excessive force claim brought against Officers Isom, Lynch, and Williams ("the Officers") in their individual capacities.

The Officers moved for summary judgment on the basis of qualified immunity, claiming that their actions were reasonable in light of the circumstances. Mrs. Margeson countered that they had engaged in "gratuitous violence" by repeatedly shooting her husband after any reasonable threat had already dissipated.

In ruling on the motion, the district court found that the initial use of force was neither unreasonable nor excessive, given that James Margeson had been pointing a gun at the Officers when they first opened fire. It further found, however, that there was a genuine factual issue as to whether the amount of force used was necessary or reasonable, given the dispute over the

number of shots fired, and whether the Officers continued to fire at Mr. Margeson after he no

longer posed a reasonable threat. The district court's reasoned as follows:

> [T]he number of shots fired can be significant. *Compare Abbott v. Sangamon Ctny.*, 705 F.3d 706, 733 (7th Cir. 2013) ("To be sure, an officer will not be held liable if the circumstances under which the force was used evolved so rapidly that a reasonable officer would not have had time to recalibrate the reasonable quantum of force") *with Brockington v. Boykins*, 637 F.3d 503, 507-08 (4th Cir. 2011) ("it is just common sense that continuing to shoot someone who is already incapacitated is not justified" and, based upon facts in the case, "thirty-three shots would be unjustified, as would twenty-nine, or even nineteen [and] six is too many"). After all, the law is clearly established that police officers cannot engage in gratuitous violence. *See McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (collecting cases). Ultimately, the question is whether, "allow[ing] for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation," the number of shots fired was objectively reasonable from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 397.

> That question simply cannot be answered from the record before the Court. It is entirely unclear how many shots were fired, or how many shots struck Mr. Margeson. Nor is it clear how many volleys of shots were fired.

> Defendants contend that only two volleys were fired . . . [and] that the number of shots was 15, based upon the fact that the TBI recovered five shotgun hulls and ten shell casings at the scene. They also argue that, while the autopsy report shows Mr. Margeson was shot a total of 21 times, that number does not accurately reflect the separate shots that hit Mr. Margeson because most of the officers were using shotguns loaded with .00 buckshot, [and so] some wounds may have been double-counted as both entry and exit wounds.

> Plaintiffs place the number of shots fired at somewhere between 36 and 43, with 20 or 21 hitting Mr. Margeson . . . based upon the autopsy report and a TBI report which logged 23 bullet holes in the residence.

> No[] . . . definitive conclusion [can] . . . be drawn from the report itself. In addition to the report, a dashboard camera from a patrol car on the scene has been submitted . . . . [T]he tape appears to capture what may have been a shot, followed by a pause, four equally spaced shots, followed by a pause, twelve equally spaced shots, and perhaps even more shots after yet another pause. Given the cadence, it seems doubtful that the evenly spaced shots are from shotgun blasts, as opposed to a pistol.

> . . . Defendants claim that Mr. Margeson dropped his rifle after the initial volley and reached for a pistol . . . . [E]ven assuming this is true, and assuming that only

two volleys were fired, it does not explain the necessity of [the last] twelve . . . shots. This is something the participants need to explain to a jury.

Based on the foregoing, the district court denied summary judgment, and the Officers appealed. The only issue on appeal is whether the district court erred in denying the Officers' motion for summary judgment on the basis of qualified immunity.

III.

A. Jurisdiction

This Court has jurisdiction over the district court's denial of qualified immunity as an appealable "final decision" within the meaning of 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Mrs. Margeson argues, as an initial matter, that the Court lacks appellate jurisdiction over this matter because the district court's denial of summary judgment hinged on its finding of a material fact as opposed to its resolution of a purely legal issue. *See Johnson v. Jones*, 515 U.S. 304, 317 (1995) (explaining that a summary judgment order denying qualified immunity is only appealable as of right if the ruling is based on a question of law); *accord Sabo v. City of Mentor*, 657 F.3d 332, 336 (6th Cir. 2011). As Mrs. Margeson concedes, however, the denial of qualified immunity "is immediately appealable as a collateral order when the issue on appeal concerns . . . whether the facts alleged showed a violation of clearly established law." *Silberstein v. City of Dayton,* 440 F. 3d 306, 310 (6th Cir. 2006); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014).

While it is true that the district court found a genuine issue of fact, its ruling necessarily resolved a question of law as well, with regard to whether the facts could give rise to an excessive force claim. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996) ("[R]egardless of the district court's reasons for denying qualified immunity, we may exercise

jurisdiction over the officers' appeal to the extent it raises questions of law."). Accordingly, the district court's order is immediately appealable insofar as it presents a legal question concerning whether the facts alleged could amount to a violation of clearly established law.

## B. Qualified Immunity

We review the district court's denial of summary judgment de novo. *Westmoreland v. Sutherland*, 662 F.3d 714 (6th Cir. 2011); *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). In doing so, the Court must "view the facts in the light most favorable to the non-moving party." *Plumhoff*, 134 S. Ct. at 2017 (citing *Wilkie v. Robbins*, 551 U.S. 537, 543 n. 2 (2007)). The plaintiff has the burden of showing that a defendant is not entitled to qualified immunity. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).

When evaluating the plaintiff's case against qualified immunity, this Court considers whether the facts alleged, viewed in the light most favorable to the plaintiff, establish that the defendants' conduct violated a "clearly established" constitutional right "to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001) and *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). However, summary judgment is not appropriate if there is a genuine factual dispute concerning whether the defendants committed acts that allegedly violated clearly established rights. *Dickerson*, 101 F.3d at 1158; *see also Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011) ("[I]f genuine issues of material fact exist as to whether the officer[s] committed acts that would violate a clearly established right, then summary judgment is improper); *accord King v. Taylor,* 694 F.3d 650, 664 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 1473 (2013).

It is undisputed that the right at issue in this case — the right against unreasonable deadly force — is a clearly established constitutional right. *Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) ("[W]ith regard to the constitutionality of an officer's use of deadly force, which also is subject to the objective reasonableness standard of the Fourth Amendment, the Supreme Court has noted that the use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" ) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).  Therefore, the central question in this case is whether the Officers' actions amounted to a violation of that right, when viewing the facts in the light most favorable to Mrs. Margeson.

A claim of excessive force is evaluated under the Fourth Amendment's "reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Under the Fourth Amendment, the objective-reasonableness test looks to the reasonableness of the force in light of the totality of the circumstances confronting the defendants. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).  If the Officers' actions were "objectively reasonable," under the totality of the circumstances, and based on the facts as alleged by Mrs. Margeson, then the Officers were entitled to qualified immunity. *See id.*  If, however — viewing the facts in the light most favorable to Mrs. Margeson — a jury could conclude that the Officers engaged in gratuitous violence by using force beyond the scope of that which was reasonably necessary or justifiable, then the district court's denial of qualified immunity must be affirmed. *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010).

The use of deadly force is justified when an officer has reason to believe that a suspect poses a threat of serious harm to the officer or others. *Garner*, 471 U.S. at 1.  This is particularly

true in the face of a rapidly evolving situation, where an officer reasonably believes "that a suspect poses a serious physical threat either to the police or members of the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007). In *Graham*, the Supreme Court cautioned courts against passing judgment on the police based on hindsight bias. *Graham,* 490 U.S. at 396. This Court has further noted that *Graham*'s admonition against using such bias "carries great weight" if "the events in question happened very quickly." *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

In the instant case, the issue is not whether the Officers' use of deadly force was reasonable in the first instance — it is undisputed Mr. Margeson pointed a rifle at them from his front door, and that any objectively reasonable law enforcement officer in that situation might fear for his own life and respond with deadly force. The issue, rather, as the district court correctly observed, is whether the *amount* of force used was reasonable, given the allegation that the Officers continued to shoot Mr. Margeson after he no longer posed any reasonable threat, and given the evidence suggesting that as many as 43 shots were fired at Mr. Margeson between the three officers.

Relying on *Brockington v. Boykins*, 637 F.3d 503, 507-08 (4th Cir. 2011), the district court found that the number of shots fired was a significant issue in this case, and ultimately concluded that such a high number of gunshots could lead a reasonable juror to find that the Officers had engaged in "gratuitous violence" exceeding any reasonable measure of force necessary to dissipate the threat posed by Mr. Margeson. The district court also emphasized the timing and sequence of the shots based on the sound recording of the incident.

On appeal, the Officers contend that it was reasonable to continue shooting at Mr. Margeson as they did, because Mr. Margeson reached for a second firearm, even after he fell to the ground from the first volley of shots. As noted by the district court, however, the Officers' allegations that Mr. Margeson pointed a second pistol at them did not necessarily justify the large number of shots fired, and their deposition testimony provided no explanation as to the "reasonableness" of the final twelve shots heard in the recording of the incident. Furthermore, the Officers' assertion that Mr. Margeson pointed a second gun appears to be in dispute, and it is entirely unclear whether Officers Lynch and Williams — who seem to have done most of the shooting after the initial round of shots — ever saw a gun or perceived any threat after Mr. Margeson had been shot to the ground.

Appellants argue that "Plaintiff [has failed] to establish *any* proof that Mr. Margeson was shot while incapacitated or while he no longer posed a threat." We disagree. Among other things, the proffered evidence in this case includes two independent reports suggesting that the Officers fired 43 shots at Mr. Margeson and an audio recording of the incident that undermines the Officers' deposition testimony about the sequence of events after the initial volley of shots. While the number of shots fired is not itself dispositive, the large number in this case is certainly relevant, since a jury could reasonably infer that Mr. Margeson became incapacitated, and was therefore unable to pose a threat after having been shot with the first few bullets. For the same reason, the Officers' reliance on *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000), where the defendants received qualified immunity even though they were alleged to have engaged in excessive force when they fired seven additional shots at the already-wounded plaintiff, seems to be somewhat misplaced on these facts. We do not intend to suggest that any number of shots is categorically reasonable or unreasonable; our reasonableness analysis hinges on the *totality* of

the circumstances. We acknowledge, however, that such a high number of shots factors into those circumstances.

Viewing the facts in the light most favorable to Mr. Margeson, a jury could certainly conclude that shooting at a man 43 times, including at least 12 shots after he had fallen to the ground, amounts to an unreasonable and excessive use of force, under the circumstances described here. A jury could also conclude, on the other hand, that the Officers' actions were reasonable, based on Mr. Margeson's alleged failure to surrender, even after having been shot down. Either way, there are disputed facts at issue that only a jury can properly decide.

Based on the disputes on the timing and sequence of the shooting in the recording which, when viewed favorably to Mr. Margeson, seem to suggest that at least twelve additional shots were fired at Mr. Margeson after he had fallen to the ground with multiple gunshot wounds, the district court was correct to conclude that the reasonableness of the Officers' actions was a question of fact that should be submitted to a jury. The factual disputes in this case — including the total number of shots fired, the circumstances that led the Officers to continue shooting at Mr. Margeson, and whether the Officers continued to shoot at him after any reasonable threat had dissipated —are critical to the ultimate reasonableness inquiry. Accordingly, because the law regarding use of force is clearly established, and because genuine issues of material fact abound in this case, summary judgment is not appropriate. *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005) (affirming the district court's denial of qualified immunity where "the factual dispute was critical in determining whether . . . [the Officer]'s use of deadly force violated . . . [the Plaintiff]'s clearly established constitutional right.").

IV.

For these reasons, the district court's denial of the Officers' motion for summary judgment is **AFFIRMED**.