**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 19a0256n.06

Case No. 18-5516

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| AURIANA WILLIAMS, | ) | |
| | ) | **FILED** May 15, 2019 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CITY OF CHATTANOOGA, TENNESSEE | ) | TENNESSEE |
| et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: SILER, COOK, and BUSH, Circuit Judges.

**SILER**, Circuit Judge. Auriana Williams, on behalf of her daughter, JSE, and herself, filed an action under 42 U.S.C. § 1983 against Chattanooga police officers Allen Griffith, Timothy Aaron McFarland, Mitchell Moss, Christopher Palmer, and Jacques L. Weary (collectively, the defendant-Officers) and the City of Chattanooga, Tennessee (the City), asserting claims relating to the Officers' fatal shooting of Javario Eagle, who was Williams's boyfriend and the father of her child. Williams alleged the defendants violated Eagle's Fourth Amendment rights through the use of excessive force. The district court granted summary judgment in favor of the Defendants, holding that the Officers did not violate the Fourth Amendment and that, by extension, the City was not liable. We AFFIRM.

I.

In December 2015, the Hamilton County, Tennessee 9-1-1 call center received a strange call from Eagle. Eagle made several bizarre statements, such as: "I'm fixing to stop all of this s---; y'all know that right?" Despite these ramblings, Eagle coherently answered the dispatcher's questions and told the dispatcher his name, address, date of birth, whether he had any weapons at his home, and that his daughter was home. The dispatcher sent police to Eagle's residence based "on a report of someone that was having a mental health issue."

Officer Kevin Cobb was the first policeman to respond to Eagle's address. Upon arrival, Cobb found Eagle and his daughter, JSE, standing at the front door. Soon after Cobb's arrival, Eagle and JSE went into the residence and Cobb heard what he believed to be a gunshot. Cobb requested a Crisis Intervention Team. A few minutes later, Eagle emerged from the residence holding a pistol. Cobb ran for cover and commanded Eagle to put the weapon down.

Sergeant Bryan Churchwell arrived soon after to provide backup. Like Cobb, Churchwell commanded Eagle to drop the weapon; Eagle did not comply with any of the commands and continued a pattern of bizarre behavior. Repeatedly, he would set the gun down and pick it up, enter and exit the apartment. Cobb and Churchwell tried to approach Eagle during the instances when Eagle put the gun down, but Eagle would pick it back up whenever they drew near.

Following a request from Churchwell, Officers Jacques Weary, Mitchell Moss, and Lorin Johnston responded to the scene and saw Eagle "ranting and raving acting crazy, irrational, saying things that did not make sense." At some point Officer Alan Griffith also arrived.

Eagle retreated to his apartment then reemerged carrying his gun in one hand, holding his daughter in his other hand such that her feet were not able to touch the ground, and cradling a samurai sword under his other arm. Officers on the scene feared that Eagle was going to shoot his

daughter because the gun appeared to be pointed at her head. Inexplicably, Eagle entered his residence and left his daughter alone on the porch. Continuing to fear for the girl's safety, the Officers beckoned her to come to them. She made it about halfway from the residence to the trees where the Officers sought cover, but stopped in the middle of the courtyard. Several more officers—Jason Palmer, Michael Trumbo, Timothy McFarland, and Jeff Lancaster—arrived at the scene in time to see Sergeant Churchwell motioning for the girl to continue forward. She did not move and Churchwell left cover to grab her and bring her to safety.

As Churchwell carried the girl, Eagle emerged from his apartment holding his gun and sword and sprinted toward Churchwell's back.[1] Fearing for the safety of Churchwell and the girl, Johnston and McFarland each fired a shot at Eagle.

After the initial two shots, Eagle fell to the ground and dropped the gun and the sword. Eagle was on the ground in a fetal position during this time, so Griffith approached him to secure his weapons. As Griffith moved toward Eagle, Eagle shifted his position, rolling onto his stomach with both arms outstretched in front of him on the ground. Eagle's head was tilted forward and looking up. At this point, Griffith, Moss, Weary, Palmer, and McFarland all fired their weapons. Eagle was struck by eight bullets and afterward moved his arms into a "push-up like position" and paused. Griffith then reached Eagle and recovered the gun. Eagle later died as a result of his injuries.

Williams filed suit in Hamilton County, Tennessee, against the City of Chattanooga, the Chattanooga Police Department, and the defendant-Officers, in their individual and official

---

[1] Whether Eagle aimed his gun at Churchwell's back is disputed. While Johnston testified that it occurred, Williams has filed an affidavit from a bystander claiming Eagle never pointed his pistol at Officers. But the fact we rely upon—that Eagle sprinted at Churchwell, while still holding the pistol—is not in dispute.

capacities. The case was removed to the Eastern District of Tennessee. Williams asserts four claims: (1) a § 1983 claim that the Officers violated Eagle's constitutional rights by using excessive and deadly force; (2) police officer liability under § 1983 for using subjectively and objectively unreasonable force; (3) municipal liability under § 1983 against the City for failing to supervise, monitor, and train its police officers; and (4) negligence under Tennessee state law against the City.

Following discovery, the Officers and the City separately moved for summary judgment. The district court granted in part and denied in part the Officers' motion. Specifically, the district court granted summary judgment to the Officers, concluding that they did not violate Eagle's constitutional rights. It also granted summary judgment in the City's favor on Williams's municipal liability claim in light of the district court's holding that the Officers did not violate Eagle's constitutional rights. Lastly, the district court dismissed Williams's state law claim without prejudice for adjudication in state court.

II.

The district court's decision to grant summary judgment is reviewed de novo. *Simpson v. Ernst & Young*, 100 F.3d 436, 440 (6th Cir. 1996).

III.

As noted, the district court found that the Officers did not violate Eagle's Fourth Amendment rights when they fired the second volley, because "it [was] reasonable for [the Officers] to believe Eagle was holding and aiming a gun prior to the second volley," and even if the Officers' belief was incorrect, "their actions were likewise reasonable." Further, the district court relied on Eagle's bizarre pattern of behavior to conclude that "a reasonable officer would

have been on high alert" and would have had "probable cause to believe Eagle presented an immediate threat of serious bodily harm to Griffith, who was a mere six feet away from Eagle."

Williams claims a jury could conclude that Eagle was not raising or reaching for a pistol when the Officers fired the second volley, and that, as a result, the Officers lacked any reason to believe that Eagle posed a threat to their safety or the safety of others.[2]

As we have previously held, "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect." *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008) (quoting *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005)). A claim for excessive force is analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The use of deadly force is objectively reasonable when the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The reasonableness of the officer's use of deadly force is based on "the totality of the circumstances," *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006), and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396; *see also Mullins v. Cyranek*, 805 F.3d 760, 765–66 (6th Cir. 2015).

In assessing whether a police officer acted reasonably in exercising deadly force, we are mindful that officers often face "tense, uncertain, and rapidly evolving" encounters that necessarily require "split-second judgments." *Graham*, 490 U.S. at 397. "After all, what constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to

---

[2] Williams concedes that the Officers did not violate Eagle's rights by firing the first volley of shots.

someone analyzing the question at leisure." *Mullins*, 805 F.3d at 766 (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996)).

As this action arises under § 1983, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). This court looks to whether the officer's use of force was unlawful or unconstitutional "based upon the 'information possessed' by the police officer involved." *Boyd v. Baeppler*, 215 F.3d 594, 600 (6th Cir. 2000) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Previously we have excused the district court's failure "to conduct this individualized analysis" in an excessive-force case because "each officer when deciding to shoot was operating under the same universe of facts regarding [the decedent]." *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015).

Here, we cannot conclude, as the district court did, that all Officers were operating in the same universe of facts because they arrived on scene in waves at various times: (1) Cobb; (2) Churchwell; (3) Weary, Moss, and Johnston; (4) Griffith; and (5) Palmer, Trumbo, McFarland, and Lancaster. Since there is no evidence in the record suggesting that all Officers were sharing the same radio or had otherwise learned of relevant preceding events, the timing of these waves dictates what the Officers knew. For instance, Cobb and Churchwell were the first two officers on the scene and witnessed Eagle dropping his weapon only to pick it back up once they had left their covered positions and witnessed Eagle rambling incoherently. Officers Weary, Moss, Johnston, and Griffith appear to have arrived in time to witness the latter, but not the former. Officers Palmer and McFarland arrived later, but in time to see Sergeant Churchwell running with Eagle's daughter and the events unfolding thereafter. The district court failed to address these distinctions.

But the result is not changed: even narrowing the inquiry to the circumstances encountered by the latest-arriving Officers, the circumstances show all defendant-Officers acted reasonably

when firing the second volley. Regardless of arrival time, each Officer responded to a "tense [and] uncertain" situation. *Graham*, 490 U.S. at 397. Every defendant-Officer arrived in time to see Eagle sprint toward Sergeant Churchwell with a pistol and a sword, only halting after being shot. After the first volley, Eagle continued to shift his position on the ground and Officers did not know where Eagle's pistol was at the time he stretched his arms out. The Officers had probable cause to shoot Eagle, even those arriving later in time, because they could have reasonably believed that Eagle was reaching for his gun as he was moving on the ground, consistent with his prior sprint toward Churchwell. Accordingly, the Officers' decisions to fire a second volley were not objectively unreasonable. *See Pollard*, 780 F.3d at 402–04 (finding that officers acted reasonably when they fired a second volley at a decedent because—based on the decedent's movements—the officers could have reasonably believed that he posed a threat to their safety or the safety of others).

Our discussion would not be complete without examination of a closely analogous, although unpublished, prior decision: *Margeson v. White City*, 579 F. App'x 466 (6th Cir. 2014). At issue in *Margeson* was whether "the amount of force was reasonable" where officers first shot an armed man and then shot him a second time after he was unarmed. *Id.* at 471–72. The officers in *Margeson*, acting on a bench warrant for the suspect's arrest, approached the suspect's house with the knowledge that the suspect was armed and willing to shoot at the police. *Id.* at 467–68. The suspect met the officers with rifle in hand and refused to comply with their commands to drop the weapon. *Id.* at 468. The officers then fired at the suspect. *Id.* After the first shot, according to the officers, the suspect dropped his rifle and then reached for a pistol. *Id.* at 469. The plaintiff denied that the suspect had reached for a pistol, and instead claimed that the officers continued to fire upon an unarmed man who no longer posed a threat after the first volley. *See id.* at 472–73. Although the record was unclear as to the timing between the two volleys—and even whether there

were more than two volleys—this court reasoned that denying summary judgment to the police was appropriate because "a jury could reasonably infer that [the suspect] became incapacitated, and was therefore unable to pose a threat after having been shot with the first few bullets." *Id.* at 472.

*Margeson* illustrates circumstances in which a jury could find that police officers did not have a reasonable basis to continue firing upon the suspect even though, according to the officers' version of events, the suspect was reaching for a firearm after being shot the first time. Unlike in *Boyd*, 215 F.3d at 603-04, where this court held that the officers were entitled to qualified immunity for firing additional shots at the already-wounded decedent who was reaching for his gun, and in *Pollard*, 780 F.3d at 400, 404, where this court held that there was probable cause to shoot the decedent a second time when he pointed his hands in the shape of a gun at the officers, in *Margeson*, there was an evidentiary basis for the jury to find no probable cause to shoot the suspect a second time because, under the *Margeson* plaintiff's version of events, the suspect could not move after he was first shot, 579 F. App'x at 472. Summary judgment for the officers in *Margeson*, therefore, was inappropriate.

There are similarities between the present case and *Margeson*. However, *Margeson* is distinguishable because even under Williams's narrative of events, Eagle continued to move his position while the gun and sword, though their precise location was unknown, remained within Eagle's reach. The facts in this case, therefore, align more with *Pollard* and *Boyd*. Even accepting Plaintiff's version of events, the officers (similar to the officers' situation in *Pollard*) had probable cause to shoot a second time, and at the very least, the Officers (as in *Boyd*) had qualified immunity.

Finally, because we find that the Officers did not violate Eagle's Fourth Amendment rights, we likewise conclude that the City cannot be subject to municipality liability. *See Moore v. City of Memphis*, 853 F.3d 866, 872 (6th Cir. 2017) ("If a plaintiff fails to establish a constitutional violation by the individual defendants, then 'the municipal defendant[] cannot be held liable under § 1983.'" (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001))).

**AFFIRMED**.