NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0522n.06

**No. 19-4048**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ADRIENNE HOOD, Administrator of the Estate of Henry Green V, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| CITY OF COLUMBUS, OHIO; JASON S. BARE; ZACHARY B. ROSEN; ERIC J. PILYA; COMMANDER GARY CAMERON; CHIEF KIM JACOBS, | ) ) ) ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) ) | |

BEFORE: MERRITT, GUY, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Plaintiff Adrienne Hood appeals the dismissal of her claims of excessive force for the death of Henry Green V in a shootout between him and plainclothes police officers Zachary Rosen and Jason Bare. The district court granted summary judgment to all defendants, holding that the officers are entitled to qualified immunity and the municipal defendants did not violate Green's constitutional rights. For the reasons explained below, we **AFFIRM** the grant of summary judgment to all defendants on all claims against them except for Officers Rosen and Bare. We **REVERSE** the grant of summary judgment to Rosen and Bare for the shots fired at Green after he was no longer a safety threat.

## I.  BACKGROUND

City of Columbus police officers Zachary Rosen and Jason Bare were partners on a plainclothes assignment as part of the police department's Community Safety Initiative in the South Linden neighborhood of Columbus.  They were assigned to patrol known crime hotspots in the community in an unmarked white GMC vehicle on June 6, 2016.  Rosen was driving the car and Bare was sitting in the second row on the passenger side.

That afternoon, Henry Green V, a 23-year-old man who lived in that neighborhood, met up with his friend Christian Rutledge at a home on Ontario Street, where he had been drinking.  Around 4:30 pm, Rutledge and Green went to another home, where Green got into a verbal dispute with a woman and decided to leave.  Green and Rutledge left the house together at around 5:45 pm and walked north on Ontario Street toward East 26th Avenue.

Sometime between 6:05 pm and 6:10 pm, the Officers were driving westbound on East 26th Avenue and encountered Green and Rutledge crossing the street.  Rutledge stopped crossing to avoid the car, but Green kept walking into the intersection toward the GMC, to "where [the Officers] probably thought they would have hit him."  The GMC came to a screeching halt. According to Rutledge, Green yelled "what the f---" repeatedly at the GMC.  According to the Officers, Green lifted his shirt to display a gun and pulled the gun out.  Rosen stated that he drove past Green then saw him in the side view mirror aiming the gun at the GMC.  Rutledge said that he could not confirm whether Green had pulled a gun out because he was on his phone at the time.

Rosen radioed in the physical descriptions of Green and Rutledge, telling police dispatch that Green pulled a gun on them.  The Officers drove around the block then eastbound on Duxberry Avenue toward Ontario Street trying to locate Green and Rutledge again north of the intersection where they had just encountered the pair.  Meanwhile, Green and Rutledge continued northbound

on Ontario Street and encountered witness Jherri Alfred. Alfred said that Green gave him a "mean-mug stare" as Alfred was getting into his car; Alfred put his gun into the holster at his hip in a way that Green could see, in order to send the message that "I don't know what you got under your shirt, but it's not going to kill me."

Less than a minute later, the Officers encountered Green and Rutledge again near the intersection of Duxberry Avenue and Ontario Street. A shootout ensued between Rosen and Bare in their unmarked GMC and Green on foot. The record contains conflicting accounts from several witnesses. The evidence as a whole indicates that the shootout happened in two segments—when the shooting first started and, after a short pause, when the Officers took their last shots.

The Officers explained the encounter as follows: they saw Green in the middle of Duxberry Avenue with his hands near his waistband where he previously had the gun. Rosen stated that he began to pull out his gun as he drove toward Green, who then pulled his gun from under his shirt; Rosen aimed his gun at Green with his right hand while putting the car in park with his left hand reaching over his body. Rosen said that he opened the door of the car with his left hand and began to get out of the car, shouting "Police!" and "Don't Move!" Rosen stated that Green pointed the gun at him and "was either firing or was about to fire his weapon at [him]." Rosen noted that he fired several shots as he fell back on his seat in the GMC; Green fired toward Rosen and the GMC, shooting out its front and back driver-side windows.

Bare explained that he got out of the car from the rear passenger door with his gun drawn and began to move around the front of the GMC toward Rosen and Green, flashing his police badge. The Officers were driving an unmarked car and the shooting started immediately after they got out of the car. Both officers were in plainclothes but stated that they were wearing their police

badges on lanyards. Rutledge stated that he did not know they were police officers at the time of the encounter.

Rutledge stated that when the shooting started, he ran westbound on Duxberry Avenue toward the house of Green's aunt and did not see the initial round of shots. Several people who were near the intersection witnessed the incident in whole or in part. Jamar Jordan, who was standing in front of his home on Duxberry Avenue and Ontario Street, said that Green did not have his gun out initially, but pulled it out after two shots from the Officers. Shantel Anderson, who was in her house on Duxberry Avenue close to the intersection, stated that she saw Green shoot out the windows of the GMC, after which the officers shot back. Harold Newsome and Erika Hickman were near the sidewalk by Anderson's house on Duxberry Avenue, with Newsome inside his vehicle and Hickman just outside. When the shots were fired, Newsome grabbed Hickman and pushed her into the vehicle under the dashboard. Neither saw Green with a gun or firing a gun. Jherri Alfred, who was by his car approximately 200 feet south of the intersection on Ontario Street, said that he saw Green hold a gun up in the air right before the shots started, though he did not know who took the first shot, and could not say whether Green shot at the Officers when his gun was initially in the air.

After the initial shots, Green momentarily moved out of Rosen's view; Rosen stated that he moved away from the GMC door and fired additional shots at Green in rapid succession, but stopped firing after Green fell to the ground and dropped his gun. Bare stated that he fired several shots at Green while Green was shooting at Rosen, and when Green fell to the ground, he also stopped firing immediately.

Jordan saw Green's gun come out of his hand once he was struck by the Officers' initial shots, and he staggered to the ground on his knees before falling flat on his back. Jordan said that

the Officers continued to shoot at Green even after he dropped his gun and while he was on his knees, but the shots stopped once he was on his back. While Newsome and Hickman had partially obstructed views, Newsome stated that "after [the police] got out of the car, [Green] was laying on the ground, they kept shooting him." Alfred said that after Green was shot several times, his gun flew out of his hand and his shoe flew in the air before he hit the ground, and that the Officers shot Green two or three more times each after he hit the ground.

Rutledge stated that he saw only the final two shots from the Officers when he turned around down the street. According to Rutledge, one of the Officers walked up to Green, who was on the ground and "looked like he was already dead," and shot him two times within two feet. Rutledge said that he heard around 17 shots in total from two different caliber guns.

The forensics evidence indicates that Green was armed with a .45-caliber semiautomatic pistol that he fired at least six times. Matthew Noedel, the City's expert witness, stated that Green's shots struck the GMC several times at the side door and the back of the rear-view mirror. Based on his analysis, Noedel also stated that Green fired shots while in a lowered stature, and that some of his bullet wounds were sustained while he was in a lowered or bent position. Plaintiff's expert witness, Francisco Diaz, analyzed Green's autopsy and photographs of Green's body and determined that the location of one of his bullet wounds suggests that Green was hit while he was down or in the process of going down. He also found that another bullet wound, a graze on the left flank, was sustained while Green was down, based on its physical characteristics. Green was shot eight times and died from a gunshot wound to the chest.

Adrienne Hood, the mother of Green and administrator of his estate, brought claims of excessive force and unreasonable seizure in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments against Rosen and Bare. Hood also sued the City of Columbus, Police

Chief Kim Jacobs, Police Commander Gary Cameron, and Sergeant Eric Pilya under a municipal liability theory. The defendants asserted qualified immunity and moved for summary judgment on all claims. The district court found that the Officers are entitled to qualified immunity and granted summary judgment on all claims in favor of Rosen and Bare; it also found that the City of Columbus and the other municipal defendants are not liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Hood filed a timely appeal.

## II.    ANALYSIS

### A.    Claims Against the Officers

On appeal, we review the "grant of summary judgment de novo." *Hanover Ins. Co. v. American Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 320–21 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Courts apply a "two-tiered inquiry to determine whether a defendant is entitled to qualified immunity." *Id*. at 321. Summary judgment is inappropriate if a court finds that 1) there are genuine issues of material fact as to whether officers violated the plaintiff's constitutional rights in an objectively unreasonable way, and 2) those rights were clearly established at the time such that a reasonable officer would have known that his conduct violated them. *Id.*

1. Constitutional Violation

To determine if an officer's use of force is excessive in violation of the Fourth Amendment, we ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). We assess "reasonableness at the moment" of the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "[T]he key inquiry is whether a reasonable officer in the same circumstances would have used the same amount of force." *Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015). Use of deadly force is reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Three factors from *Graham* guide our analysis: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Goodwin*, 781 F.3d at 321 (quoting *Graham*, 490 U.S. at 396). Ultimately, we determine whether "the totality of the circumstances justified a particular sort of search or seizure." *Garner*, 471 U.S. at 9; *see id.*

For the first *Graham* factor—the severity of the crime at issue—the Officers said they drove to the intersection of Duxberry Avenue and Ontario Street to find Green because he pulled a gun on them at the intersection of East 26th Avenue and Ontario Street. We apply the first *Graham* factor based on the encounter at the East 26th Avenue intersection. Green had a gun and no evidence contradicts the Officers' assertion that he pulled it out. The only other witness was Rutledge, who could not say whether Green pulled out the gun because he was on his phone at the time. According to Rutledge, the Officers had to stop abruptly when Green walked in front of

their unmarked GMC, and Green was angry and yelled at the Officers. The Officers immediately reported to dispatch that Green pulled out a gun. The Officers stated that they believed Green "posed a serious threat to anyone in the area," and they intended to "get[] eyes on Green to make sure that he was taken into custody as soon as possible." Considering all these circumstances, it was reasonable for the Officers to notify the police dispatch of the encounter and to continue their investigation. The record does not present a dispute of material fact on the first *Graham* factor.

The other *Graham* factors—and whether there was a violation of Green's constitutional rights—turn on the events at the intersection of Duxberry Avenue and Ontario Street. Because the shooting started almost immediately after the Rosen stopped their unmarked GMC, there is no evidence that the Officers made any attempt to arrest Green or that Green attempted to resist or evade arrest. The only remaining question is whether Green posed an immediate safety threat such that the Officers acted reasonably in drawing and firing their weapons. "The fact that a situation unfolds quickly 'does not, by itself, permit [officers] to use deadly force.' Rather, qualified immunity is available only where officers make split-second decisions in the face of serious physical threats to themselves and others." *Mullins*, 805 F.3d at 766–67 (quoting *Smith v. Cupp,* 430 F.3d 766, 775 (6th Cir. 2005)). This analysis turns on the two segments of the encounter, which we analyze in turn.

### a.      The Officers' Initial Shots

Several witnesses, including Officers Rosen and Bare, Jordan, Anderson, and Alfred, and the forensic evidence indicated that Green pulled his gun and fired at the Officers at some point. Hickman and Newsome did not see Green with a gun, but they had partially obstructed views and were occupied with getting out of the way when the shooting began.

We have held that "an officer may use deadly force whenever he or she, in the face of a rapidly unfolding situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007). Even if Green did not fire first, the Officers could still be "acting reasonably under the circumstances known to them [and] in defense of their own safety and the safety of officers through the use of deadly force." *Boyd v. Baeppler*, 215 F.3d 594, 600 (6th Cir. 2000). In *Mullins v. Cyranek*, we found to be reasonable a police officer's use of deadly force in response to a suspect pulling out a previously concealed weapon and throwing it over his shoulder. 805 F.3d at 767. We noted that the suspect there "had his finger on the trigger of a gun, and at that time, he posed a serious threat to [the officer] and the general public." *Id.* And in one of the more recent cases on this subject, the Supreme Court found that an officer who shot a woman engaging in erratic behavior with a knife is entitled to qualified immunity, where the officer assessed in mere seconds that she was a potential danger to another person. *Kisela v. Hughes*, 138 S. Ct. 1148, 1151–53 (2018) (per curiam). Likewise, objectively reasonable officers could have viewed Green, who pointed and fired a gun at the Officers in close proximity, as a serious and immediate safety threat to themselves and others. The totality of the circumstances—the proximity of Green to the Officers, the fact that he had a gun with him and either shot at or was about to shoot at the Officers, and the split-second decision that the Officers had to make—suggest that the Officers did not violate Green's constitutional rights when they first fired at Green.

### b. The Officers' Last Shots

Even if it was reasonable for the Officers to open fire, however, that does not automatically clear the entire encounter of the Constitution's prohibition against excessive use of force. We have analyzed similar claims in segments and found some parts of police officers' actions to be

reasonable and other parts to be unreasonable. *See, e.g., Russo v. City of Cincinnati,* 953 F.2d 1036, 1044–45 (6th Cir. 1992) (analyzing separately three distinct excessive force claims raised by the plaintiffs even though they were part of one incident); *Pleasant v. Zamieski,* 895 F.2d 272, 276 (6th Cir. 1990) (analyzing whether the officer's actions in arresting a suspect were objectively reasonable in two components: the officer's decision to (1) draw his gun and (2) not to return the gun to its holster). In *Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007), we reiterated that "[i]t is crucial for the purposes of this inquiry to separate [the officer's] decision-points and determine whether each of his particular decisions was reasonable."

Hood alleged that the Officers continued to shoot at Green even after he no longer held a gun and was falling or already down on the ground. The district court dismissed this argument and declined to adopt a segmented analysis because it viewed all the shots as a single incident. Citing *Stevens-Rucker v. City of Columbus*, the court found that the Officers' shots were not separated by "such a significant gap in time that they must be viewed as distinct incidents requiring individualized analysis." 739 F. App'x 834, 844 (6th Cir. 2018). In *Stevens-Rucker*, the court found that all the officer's shots were part of a single incident because the last shots were fired "within a second or even fractions of a second" and there "was not enough time for [the officer] to stop and reassess the threat level between the shots." *Id.* While all the shots fired were in quick succession here, Rosen himself remembered a momentary lapse when Green disappeared from his view. And Rutledge's observation that the Officers walked over to Green and took more shots while Green was on the ground shows a segment of the event separate from the initial shots. Alfred, who was by his car on Ontario Street, also said that the Officers continued to shoot at Green even as he was falling to the ground, and then they each took two or three more shots when

Green was on the ground. It appears that there were gaps between the Officers' shots, and they had time to reassess Green's threat.

Applying a segmented approach to this situation, the question is whether "the officers' initial decision to shoot was reasonable but there was no need to continue shooting." *Dickerson v. McClellan*, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996) (citing *Ellis v. Wynalda,* 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.")) "We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006). In *Russo v. Cincinnati*, for example, we held that a reasonable jury could find that the officers violated the suspect's constitutional rights with the use of deadly force when they repeatedly shot at the suspect, even after he dropped his weapon and posed no serious threat of physical harm. 953 F.2d at 1045. In *Margeson v. White Cty., Tenn.*, police officers entered the suspect James Margeson's residence, who grabbed his gun and pointed it at the officers. 579 F. App'x 466, 468 (6th Cir. 2014). Multiple officers shot at Margeson, and he suffered 21 separate gunshot wounds. *Id.* We held that while any objectively reasonable officer would respond with deadly force in the first instance, the officers there were not entitled to qualified immunity on summary judgment because the record suggested that "at least twelve additional shots were fired at Mr. Margeson after he had fallen to the ground with multiple gunshot wounds," and that "a jury could reasonably infer that Mr. Margeson became incapacitated, and was therefore unable to pose a threat after having been shot with the first few bullets." *Id.* at 472.

Both Rosen and Bare said they stopped shooting when Green fell to the ground. In cases involving the use of deadly force, the deceased suspect is unable to tell what occurred, and "[a]

court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Several witnesses discredit the Officers' claim. Rutledge stated that the Officers "were walking up on [Green's] body," which was "flat on the ground," and shot him twice. Rutledge added that the Officers were "basically checking like he don't move or nothing like that. . . . [H]e was already flat, so I don't see why the actual two gunshots was necessary." Alfred, from his vantage point down the block, stated that shots continued after Green had dropped his gun, "As he's going down, like his gun done flew out his hand, . . . shots are still being [fired]. No. They still going. Then they stop." Jordan, who was outside his home right at the intersection, said the police stopped shooting Green when he was flat on his back, but likely fired a shot while he was down on one knee, in the process of falling down. The experts from both parties indicated that some of Green's gunshot wounds were sustained while he was in a "lowered" position, likely when he was down on the ground or in the process of going down.

Considering the totality of the circumstances as explained by the multiple witnesses, including expert witnesses, the encounter between the Officers and Green is similar to the circumstances in *Russo* and *Margeson*, where the police continued to shoot even after the suspects were incapacitated, on the ground, and no longer safety threats. Genuine issues of material fact exist as to when the Officers stopped shooting at Green. This dispute is material to whether the Officers continued to shoot at Green after he was no longer a physical threat, in violation of Green's constitutional rights. Drawing all reasonable inferences in favor of Hood, the nonmoving

party, a jury could reasonably conclude that the Officers' use of force in this context was unreasonable.

### 2. Clearly Established Law

We turn to the second inquiry of the qualified immunity analysis: whether "the right was clearly established at the time of the alleged violation." *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012). A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Goodwin*, 781 F.3d at 325 (quoting *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011)). To find a clearly established right, we ask whether the defendants had "fair warning" that the actions were unconstitutional; an unconstitutional act may be clearly established without an existing case with the exact same, or even "fundamentally similar" or "materially similar" facts. *Id.* (quoting *Cummings v. City of Akron*, 418 F.3d 676, 87 (6th Cir. 2005)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

As discussed above, the use of force is excessive as a matter of law once the suspect has been incapacitated or neutralized and is no longer a safety threat. *See, e.g.*, *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006); *Baker*, 471 F.3d at 607; *Dickerson*, 101 F.3d at 1162 n.9. There may be instances when an officer is lawfully justified in using deadly force even on an already wounded suspect. In *Boyd v. Baeppler*, for example, we held that an officer was entitled to qualified immunity when he fired on a wounded suspect, because the evidence there indicated that the suspect was pointing a gun at the officers even after being wounded. 215 F.3d at 603. We have also held that "even when a suspect has a weapon, but the

officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified." *Bouggess*, 482 F.3d at 896. And in *Russo v. Cincinnati*, we reversed the district court's grant of summary judgment to the officers on qualified immunity grounds because the "plaintiffs raised a genuine issue of fact as to whether . . . the officers may have shot [the suspect] even though he posed no serious threat of physical harm." 953 F.2d at 1045. Several witnesses stated that the Officers here continued to shoot Green after he dropped his gun and was falling or already down on the ground. Our precedents provide "fair warning" to the Officers that shooting at Green after he was no longer a safety threat is unconstitutional. Officers Rosen and Bare are not entitled to qualified immunity on summary judgment.

### B.      Claims Against the Remaining Defendants

Under *Monell*, local government units, including local government officials, may be liable under § 1983 only when the constitutional deprivation arises from a government custom or policy. 436 U.S. at 691. We have held that a plaintiff may establish constitutional deprivation in four ways: "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015). *Monell* liability requires the plaintiff to "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).

Hood did not address any of these factors in the summary judgment proceeding below, and she does not argue the law supporting a *Monell* claim in her appellate brief. The district court did

not err in granting summary judgment in favor of the defendants on Hood's claims of municipal liability.

### III.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the grant of summary judgment to all defendants on all claims, except for the claims against Officers Rosen and Bare.  We **REVERSE** the grant of summary judgment to Rosen and Bare for the alleged shots at Green after he was no longer a safety threat.  We **REMAND** the case for further proceedings consistent with this opinion.

**RALPH B. GUY, JR., Circuit Judge, concurring in part and dissenting in part**.

I concur in the majority opinion except for the conclusion that there is a genuine dispute whether the officers continued to shoot at Green after a reasonable officer would have known that Green no longer posed a safety threat. The exchange of gunfire was brief, and the officers fired all of their rounds within a period of approximately five seconds. I cannot agree that the officers had time "to stop and reassess the threat level" before the last shots were fired. *Stevens-Rucker*, 739 F. App'x at 844. In my view, no reasonable juror could find there was a point at which an objectively reasonable officer would have known that Green was no longer a threat. I would affirm the district court's judgment in full.